**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE:** | : | |
| | : | |
| **EMERGENCY MONITORING** | : | |
| **TECHNOLOGIES, INC.,** | : | |
| | : | **Bankruptcy No. 05-28055-MBM** |
| Debtor. | : | |

............................................................:...........................................................

| | | |
|---|---|---|
| **Robert Shearer, Trustee of the Estate** | : | |
| **of Emergency Monitoring** | : | |
| **Technologies, Inc.,** | : | **Chapter 7** |
| Plaintiff, | : | |
| | : | |
| v. | : | **Adversary No. 06-2400-MBM** |
| | : | |
| **Steve Tepsic,** | : | |
| Defendant. | : | |

Appearances:    Owen W. Katz, for Robert Shearer, the Chapter 7 Trustee.
                Joel M. Helmrich and Gary A. Kern, for Steve Tepsic.

<u>**MEMORANDUM OPINION**</u>

Robert Shearer, the Chapter 7 Trustee for the bankruptcy estate of

Emergency Monitoring Technologies, Inc., the instant debtor (hereafter

respectively "the Trustee" and "the Debtor"), commenced the instant adversary

proceeding so as to avoid as preferential and/or fraudulent several transfers (or

alleged transfers) that occurred between the Debtor and Steve Tepsic, the

instant defendant (hereafter "Tepsic").  The genesis for such transfers is a stock

redemption transaction that occurred between the Debtor and Tepsic in August

1999, and the Trustee seeks as well to avoid as fraudulent such stock

redemption transaction.  Tepsic moves for summary judgment in his favor with

respect to the entirety of the Trustee's complaint (Doc. #17),[1] and the Trustee

essentially moves for summary judgment in his favor with respect to the

avoidance of all of the transfers that he seeks to avoid other than the aforesaid

August 1999 stock redemption transaction (Doc. #29).  For the reasons set forth

below, the Court grants to the Trustee much, but not all, of the relief that he

seeks in his summary judgment motion.

## SUMMARY JUDGMENT STANDARD

The law regarding summary judgment adjudication is succinctly set forth

as follows:

> On a summary judgment motion, the movant must show that
> "there is no genuine issue as to any material fact and that the
> moving party is entitled to a judgment as a matter of law."
> Fed.R.Civ.P. 56(c).  Once the movant satisfies this initial burden,
> then the non-movant must respond with information to the contrary
> or it will lose.  Fed.R.Civ.P. 56(e).

National State Bank v. Federal Reserve Bank, 979 F.2d 1579, 1581-1582 (3rd

Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323-25, 106 S.Ct. 2548,

2552-54, 91 L.Ed.2d 265 ([U.S.] 1986)).  "If the nonmoving party has the burden

of persuasion at trial, [then] 'the party moving for summary judgment may meet

its burden [of showing that it is entitled to a judgment as a matter of law] by

showing that the evidentiary materials of record, if reduced to admissible

---

[1]All of the docket references that are contained in the instant opinion are
references to the docket for Adversary No. 06-2400-MBM.

evidence, would be insufficient to carry the nonmovant's burden of proof at trial.'"

Jalil v. Avdel Corp., 873 F.2d 701, 706 (3rd Cir. 1989) (citing Chipollini v.

Spencer Gifts, Inc., 814 F.2d 893, 896 (3rd Cir. 1987), which case, in turn, cites

Celotex, 477 U.S. 317, 106 S.Ct. at 2555); *see also* Celotex, 477 U.S. at 323,

106 S.Ct. at 2552 (same).

> Where the party moving for summary judgment is the
> plaintiff, or the party who bears the burden of proof at trial, the
> standard is more stringent.  The Third Circuit has stated that "where
> the movant bears the burden of proof at trial and the motion does
> not establish the absence of a genuine factual issue, the district
> court should deny summary judgment even if no opposing
> evidentiary matter is presented."

National State Bank, 979 F.2d at 1582 (citing Resolution Trust Corp. v. Gill, 960

F.2d 336, 340 (3rd Cir. 1992)).

Given the foregoing statement of the law, it is not surprising that a factual

dispute itself, as a matter of law, can be viewed as

> "genuine" only if the evidence is such [regarding the fact subject to
> dispute] that a reasonable jury[, with respect to such factual
> dispute,] could return a verdict for the nonmoving party.  Anderson
> v. Liberty Lobby, Inc., 477 U.S. 242, 247-49, 106 S.Ct. 2505, 2510,
> 91 L.Ed.2d 202 ([U.S.] 1986); Equimark Comm. Finance Co. v.
> C.I.T. Financial Serv. Corp., 812 F.2d 141, 144 (3d Cir. 1987).  If
> evidence is "merely colorable" or "not significantly probative,"

3

summary judgment may be granted.  Anderson, 477 U.S. at 249-51, 106 S.Ct. at 2511; Equimark, 812 F.2d at 144.  Where the record, taken as a whole, could not "lead a rational trier of fact to find for the nonmoving party, summary judgment is proper." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 ([U.S.] 1986).

Hankins v. Temple University, 829 F.2d 437, 440 (3rd Cir. 1987).

Also important to note is that, even if a genuine factual dispute is shown to exist, such showing may not necessarily suffice to preclude the entry of a summary judgment.  Indeed,

the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.

Anderson, 477 U.S. at 247-48, 106 S.Ct. at 2510 (emphasis theirs).

All of the foregoing notwithstanding, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id., 477

4

U.S. at 249, 106 S.Ct. at 2511.  Therefore, any evidence that the movant

presents in an attempt to carry its initial summary judgment burden "must be

viewed in the light most favorable to the non-moving party."  National State Bank,

979 F.2d at 1581 (citing O'Donnell v. United States, 891 F.2d 1079, 1081-82 (3rd

Cir. 1989)).  As well, "'the court must accept as true all reasonable inferences

that favor the nonmoving party.  However, ... [a court] may only consider

reasonable inferences; ... [it] may not improperly consider those inferences that

are unreasonable.'"  Elwell v. PP & L, Inc., 2002 WL 31160109 at 4 (3rd Cir.

2002) (quoting from the lower court's decision, which it affirmed) (emphasis in

original).

## **STATEMENT OF FACTS**[2]

The Debtor, a Pennsylvania corporation, was created on March 1, 1991.

From its inception, the Debtor's business consisted of selling emergency

monitoring equipment and services for home use.  The consumers, who were

---

[2]The facts set forth in the text that follows the instant footnote, other than
those that are subsequently noted in such text to be subject to a genuine dispute,
fall into one of two groups.  First are those facts that are concededly undisputed,
that is those facts that are asserted as such (i.e., facts) in the papers of both of
the parties.  Second are those facts that are asserted as such in the papers of
just one of the parties, but which are not subject to a genuine dispute.  With
respect to the latter set of facts, the Court concludes that such facts are not
subject to a genuine dispute (a) after verification by the Court of the factual
assertions in question by reference to the documents cited in support thereof,
and (b) because such factual assertions were either not responded to, or were
not the subject of a sufficient response, by the opposing party.  Consistent with
the above statement of the law regarding summary judgments, the aforesaid two
groups of facts, that is those facts other than those which are noted to be subject
to a genuine dispute, can be, and thus are, taken to be established henceforth for
purposes of dealing with the parties' summary judgment motions.

5

identified by the Debtor through telemarketing, purchased the monitoring

equipment for an upfront fee, after which they then paid a monthly monitoring fee

of $25.  Because the Debtor did not actually perform the monthly monitoring

service, it collected the $25 monthly fee associated with such service, paid over a

portion of such fee – $5 – to the third party that actually performed such service,

and then retained the rest itself (i.e., $20).  The upfront fees and the portion of

the monthly monitoring fees that the Debtor retained constituted the Debtor's

primary sources of income.  Each such sale that the Debtor generated was

reduced to a written contract; such contracts are hereafter referred to as

"Monitoring Contracts."[3]

From March 1, 1991, until August 31, 1999, Tepsic was the sole

shareholder, sole director, and the president of the Debtor.  As of August 31,

1999, the Debtor had 5,000 shares of stock, only 1,000 of which were

outstanding and, as just set forth, each of which was owned by Tepsic.

**I.**  **The 1999 Redemption.**

On August 16, 1999, Tepsic caused the Debtor, in his capacity as the sole

shareholder, sole director, and president of the Debtor, to enter into a written

agreement (hereafter "the 949 Stock Sale Agreement") whereby the Debtor

agreed to buy back from Tepsic 949 shares of stock in the Debtor for

$1,573,785.54 (hereafter "the Redemption Price"), that is the Debtor agreed to

---

[3]For a select few of the Monitoring Contracts, the monthly monitoring fee
that the Debtor charged was actually $30 rather than $25.

6

redeem such 949 shares of stock (hereafter "the 1999 Redemption").[4]  Also on

August 16, 1999, Tepsic agreed in writing (hereafter "the 51 Stock Sale

Agreement") to sell the remaining 51 outstanding shares of stock in the Debtor to

Daniel Duvall, who was at the time the Debtor's general manager (hereafter

"Duvall"); Duvall agreed to pay $84,576.46 for such 51 shares of stock in the

Debtor.  Both the 949 Stock Sale Agreement and the 51 Stock Sale Agreement

provide, at paragraph 3(c) in both such documents, that the two aforesaid stock

transfers were contingent on the execution of, *inter alia*, (a) a promissory note

given by the Debtor to Tepsic obligating the Debtor to pay the Redemption Price,

and (b) a security agreement given by the Debtor to Tepsic, whereby the Debtor

would grant to Tepsic a security interest in "all of the Corporation's [(i.e., the

Debtor's)] present and future monitoring accounts, inventory and accounts

receivable."  As well, on August 16, 1999, Tepsic adopted a number of

resolutions in his capacity as the sole director of the Debtor, and in lieu of a

meeting of the Debtor's board of directors, among which were that the Debtor

would be authorized to (a) execute the aforesaid promissory note, and (b) grant

the aforesaid security interest (hereafter "the August 16, 1999 Action in Writing").

*See* Def's. Mot. Summ. J. (Doc. #17) Ex. G ("Action in Writing in Lieu of a Special

Meeting of the Board Of Directors").

The 1999 Redemption was essentially consummated on August 31, 1999,

---

[4]Tepsic executed the 949 Stock Sale Agreement both on behalf of himself
as seller of the 949 shares and on behalf of the Debtor as the purchaser of such
shares.

when the Debtor, in return for the 949 redeemed shares of stock in itself,

delivered to Tepsic a promissory note from the Debtor dated August 31, 1999

(hereafter "the Promissory Note").  The Promissory Note obligated the Debtor to

pay the Redemption Price to Tepsic in 84 monthly instalments of $17,000.23 with

a final balloon payment of $590,604.68 due on October 1, 2006.

Also on August 31, 1999, and as part of the 1999 Redemption, the Debtor

executed a security agreement (hereafter "the Security Agreement"), thereby

granting to Tepsic a security interest in the following:

> a) All monitoring accounts and contracts;

> b) All 800 telephone numbers owned by debtor;

> c) All accounts receivable; and

> d) All inventory.

together with all accessions, parts, accessories, attachments and

appurtenances thereto appertaining, attached to or installed in or

kept or used or intended to be used in connection therewith and all

substitutions or renewals thereof, or improvements, replacements

and additions thereto, and the proceeds (cash and non-cash) of all

the foregoing.

*See* Def's. Mot. Summ. J. (Doc. #17) Ex. R (Security Agreement ¶ 1).  According

to the face of the Promissory Note, the security interest granted in the Security

Agreement was given by the Debtor to Tepsic to secure not only the Debtor's

obligations under the Promissory Note but also (a) the Debtor's other obligations

under the 949 Stock Sale Agreement, and (b) Duvall's obligations under the 51

8

Stock Sale Agreement.  Tepsic perfected his security interest in September 1999 and continued such perfection on April 8, 2004.

Additionally, the Debtor and Tepsic executed an "Assignment of Accounts Receivable" on August 31, 1999 (hereafter "the Assignment of Accounts Receivable"), wherein the Debtor, as additional security for its payment of the amount due under the Promissory Note and its performance of obligations under the 949 Stock Sale Agreement, "collaterally ... assign[ed]" to Tepsic – and agreed that Tepsic would have a security interest in – "all of Debtor's accounts receivable, including all sums due ... [Debtor][5] on all monitoring accounts and contracts, now owned or hereinafter acquired by Debtor."  *See* Def's. Mot. Summ. J. (Doc. #17) Ex. S (Assignment of Accounts Receivable ¶ 1).

Finally, Duvall (a) personally guaranteed to Tepsic, on August 31, 1999, by way of a document entitled "Surety," the Debtor's payment of the Redemption

---

[5]The Assignment of Accounts Receivable actually collaterally assigns to Tepsic "all of Debtor's accounts receivable, including all sums due ***Creditor*** on all monitoring accounts and contracts, now owned or hereinafter acquired by Debtor."  (emphasis added)  The Assignment of Accounts Receivable defines "Creditor" as Tepsic.  The Court presumes that the drafter of such document mistakenly used the term "Creditor" in such language and, instead, intended to use the term "Debtor" because, otherwise, such language makes no sense. Indeed, the sums due under the accounts and contracts were due and payable to the Debtor rather than Tepsic, at least with respect to the Monitoring Contracts that were created prior to September 8, 2004.  As well, it would (a) not be legally possible for the Debtor to have assigned to Tepsic any amounts that were actually due and payable to Tepsic rather than the Debtor for, in such case, the Debtor would not have owned such amounts, thereby precluding their assignment by the Debtor, and (b) be unnecessary for Tepsic to take an assignment, especially a collateral assignment (and thus a security interest), in money that already belonged to him.  Therefore, the Court shall henceforth consider the aforesaid reference to "Creditor" in the Assignment of Accounts Receivable to mean "Debtor."

9

Price pursuant to the Promissory Note, (b) pledged to Tepsic, and thereby granted to Tepsic a security interest in, the 51 shares of stock in the Debtor that Duvall was purchasing from Tepsic, which pledge and security interest was given to Tepsic on August 16, 1999, by way of a "Pledge Agreement" so as to collateralize the Debtor's performance under the Promissory Note and Duvall's aforesaid personal guarantee thereof (hereafter "the Pledge Agreement"), and (c) executed, as additional security for the aforesaid performance by the Debtor and guarantee by Duvall, a "Proxy" on August 16, 1999, thereby irrevocably appointing Tepsic as his agent and proxy with respect to the aforesaid 51 shares of stock and, thus, authorizing Tepsic to act on Duvall's behalf with respect to such shares as if Tepsic were himself acting (i.e., Tepsic was thus given the power to vote such shares as he saw fit either at a meeting of the Debtor's shareholders – and Duvall was the lone shareholder – or by written consent in lieu of such a meeting) (hereafter "the Proxy").

On August 31, 1999, (a) Tepsic resigned his positions as director, president, secretary, and treasurer of the Debtor, (b) Tepsic exercised the Proxy, thus voting all of Duvall's 51 shares of stock in the Debtor, and thereby elected Duvall to be the sole director of the Debtor, *see* Def's. Mot. Summ. J. (Doc. #17) Ex. N ("Action in Writing in Lieu of a Special Meeting of Shareholders"), and (c) Duvall, then acting as the sole director of the Debtor, elected himself the president, secretary, and treasurer of the Debtor.

For the three-year period prior to, and inclusive of, the 1999 Redemption (i.e., 1997 – 1999), the Debtor's annual profits, that is the Debtor's annual net

income plus interest expense, were at a level that would have been insufficient to allow the Debtor to service the $204,002.76 worth of Redemption Price monthly instalment payments that the Debtor, on an annual basis, became obligated to make to Tepsic (i.e., $17,000.23 monthly pmt. x 12 months).  For the succeeding three-year period (i.e., 2000 – 2002), the Debtor's annual profits remained at a level below the aforesaid annual $204,002.76 obligation to Tepsic.

As of August 31, 1999, when the 1999 Redemption was consummated, the Debtor's assets consisted essentially of nothing other than (a) approximately $17,000 in collected but undeposited monthly monitoring fees, (b) $15,000 of funds that Duvall held but which he was going to deposit on behalf of the Debtor, and (c) approximately 850 Monitoring Contracts, which contracts were worth $200 to $300 each.  Thus, assuming that each of the aforesaid Monitoring Contracts was worth $300, the total value of the Debtor's assets as of August 31, 1999, equalled $287,000.  Immediately after the consummation of the 1999 Redemption, the total amount of the Debtor's liabilities equalled at least $1,573,785.54, since such amount, as set forth above, was the Redemption Price that the Debtor then became obligated to pay to Tepsic.  The 1999 Redemption thus immediately rendered the Debtor insolvent (i.e., $287,000 in assets < $1,573,785.54 in liabilities), and by a substantial amount.

## II.    The September 8, 2004 Transfer.

From October 1999 up to September 2004 the Debtor made 58 Redemption Price monthly instalment payments to Tepsic, each in the amount of $17,000.23, for a total amount paid of $986,013.34.  However, the Debtor, under

11

Duvall's management, defaulted on its obligations under the Promissory Note

and other related documents by failing to make both the April and September

2004 Redemption Price monthly instalment payments.  As a result, on

September 8, 2004, and in response to a demand by Tepsic dated September 7,

2004, made pursuant to Tepsic's rights under the various relevant documents,

the Debtor turned over to Tepsic all of its accounts receivable, monitoring

contracts, and 800 telephone numbers (hereafter "the September 8, 2004

Transfer").  Put differently, Tepsic executed on his security interest on such date

and believed in so doing that he was thereby entitled to seize essentially all of

the Debtor's assets, which belief was apparently shared by Duvall on behalf of

the Debtor.  Indeed, Tepsic and Duvall, on behalf of the Debtor, executed a

"Settlement Agreement" dated September 8, 2004, whereby the Debtor

transferred the foregoing assets to Tepsic in return for Tepsic's extinguishment of

the outstanding debt due under the Promissory Note.  The debt due to Tepsic

under, and pursuant to the terms of, the Promissory Note immediately prior to the

September 8, 2004 Transfer equalled $1,117,548.54, which amount consisted of

the accelerated remaining Redemption Price monthly instalment payments (i.e.,

$936,167.82), the two delinquent instalment payments for April and September

2004 (i.e., $34,000.46), late charges for such delinquent payments (i.e.,

$1,700.02), and an attorney's collection fee (i.e., $145,780.24).  *See* Def's. Mot.

Summ. J. (Doc. #17) Ex's. X ("Settlement Agreement") & Y ("Bill of Sale," dated

9/8/04); Pl's. Resp. to Def's. Mot. Summ. J. (Doc. #27) (Ex. A to Duvall Dep. –

12

9/7/04 letter to Duvall from Tepsic's attorney).[6]

Following the September 8, 2004 Transfer, the only asset that the Debtor had of note was $10,000 to $15,000 in cash on deposit in a bank.  Although Tepsic, as part of the September 8, 2004 Transfer, extinguished the outstanding debt due under the Promissory Note, the Debtor was still liable, at that time, for numerous other debts – including federal income tax withholding obligations that had accrued since, at least, March 31, 2002 – such that, after such transfer, the Debtor's liabilities far exceeded its assets.

## III.   The Post-September 8, 2004 Transfer.

Although the September 8, 2004 Transfer left the Debtor with practically no remaining assets, the Debtor continued to operate its business.  Supposedly pursuant to an oral contract entered into by Tepsic, Duvall, and the Debtor on or about September 15, 2004, Tepsic, on an independent contractor basis, returned to assist in the Debtor's operations, supposedly by generating new customers for the Debtor.  Pursuant to such oral contract, the Debtor would retain the upfront installation/equipment fee associated with each new Monitoring Contract that was generated by Tepsic, after which Tepsic would receive, as his sole compensation, the subsequent monthly monitoring fees associated with each such contract.  The parties dispute – and genuinely, the Court finds – what

---

[6]The items that comprise the total amount due under the Promissory Note prior to the September 8, 2004 Transfer actually add up to $1,117,648.54, which amount is the total due as set forth on the 9/7/04 letter to Duvall from Tepsic's attorney.  The Court will utilize the figure of $1,117,548.54 only because it appears in two agreements (i.e., the Settlement Agreement and the 9/8/04 Bill of Sale).

13

Tepsic was to actually receive by virtue of such oral contract.  The Trustee
contends that Tepsic had a wholly unsecured contractual claim against the
Debtor equal in amount to the sum of the monthly monitoring fee income streams
associated with each post-September 8, 2004 Monitoring Contract that was
generated by Tepsic, which claim was not to be satisfied until the Debtor
collected such income stream from each customer associated with each such
contract – i.e., each such income stream, that is each such receivable and then
the cash upon collection of such receivable, constituted property of the Debtor,
which property the Debtor, in turn, used to satisfy its contractual debt to Tepsic.
Tepsic, on the other hand, contends that each such income stream, that is the
receivable and then the cash associated with each such contract, constituted
property that he owned from the point when he generated each such contract –
i.e., the Debtor never owned such income streams (the Debtor owned bare legal
title to such income streams but Tepsic owned the equitable interest therein), the
Debtor just passed the cash through to Tepsic when it collected upon the
receivables, and thus Tepsic never even really had (or needed) a contractual
claim, let alone an unsecured contractual claim, against the Debtor equal in
amount to the sum of such income streams.

On or about June 16, 2005, the Debtor transferred all post-September 8,
2004 Monitoring Contracts to Tepsic (hereafter "the Post-September 8, 2004
Transfer").  The Post-September 8, 2004 Transfer occurred notwithstanding,
argues the Trustee, that Tepsic did not generate all of the Monitoring Contracts
created after September 8, 2004.  As support for the position that Tepsic did not

14

generate many of such contracts, the Trustee points to the undisputed fact that

substantial sales commissions were paid by the Debtor to other salesmen

between September 14, 2004, and July 28, 2005.  The Court understands Tepsic

to contend that, even though such commissions were paid, he nevertheless

generated all of such contracts.  Also arguably relevant to the Post-September 8,

2004 Transfer, the Debtor (via Duvall) and Tepsic executed a document entitled

"Bill of Sale" on or about June 15 – 17, 2005 (hereafter "the June 2005 Bill of

Sale"), wherein it is represented that, by virtue of such document, the Debtor

transferred a substantial number of the post-September 8, 2004 Monitoring

Contracts to Tepsic.  The Trustee contends that the June 2005 Bill of Sale was

so executed to effectuate part of the Post-September 8, 2004 Transfer, while the

balance of such transfer – i.e., the rest of the post-September 8, 2004 Monitoring

Contracts that were so transferred – was undocumented.  Tepsic contends, on

the other hand, that the June 2005 Bill of Sale was inappropriately so titled, that

is that it really did not operate to transfer any post-September 8, 2004 Monitoring

Contracts to him because, as set forth in the last paragraph, Tepsic takes the

position that he owned the true remaining value of such contracts – i.e., the

income stream associated therewith – from their beginning.  The Court finds to

be genuine the parties' dispute as to (a) whether Tepsic generated all of the

Monitoring Contracts created after September 8, 2004, and (b) the significance of

the June 2005 Bill of Sale.

IV.    **Tepsic's Sale of the Monitoring Contracts to VSI and the Debtor's Bankruptcy Filing.**

Also on or about June 16, 2005, Tepsic sold 1,092 Monitoring Contracts – presumably all of the Monitoring Contracts that he had received from the Debtor via the September 8, 2004 Transfer and the Post-September 8, 2004 Transfer – to Vector Security, Inc. (hereafter "VSI"), which sale netted Tepsic $547,221.33. The $547,221.33 net sales price was computed by multiplying $27,475 (the sum of the monthly monitoring fees associated with each of the 1,092 Monitoring Contracts)[7] by a multiple equal to 21, and then subtracting from such product a prepayment deduction of $29,753.67;[8] thus, the actual average selling price for each of the 1,092 Monitoring Contracts equalled approximately $501 (i.e., $547,221.33 divided by 1,092).  The Trustee, as set forth in footnote 14 of his Response to Defendant's Motion for Summary Judgment (Doc. #27), arrives at – for purposes of such motion and, presumably, the Trustee's competing summary judgment motion as well – an adjusted average selling price for each of the 1,092 Monitoring Contracts equal to $497, which price the Court (a) finds to be conservatively established given that (i) it is based on a monthly monitoring fee for each Monitoring Contract of $25, and (ii) such fee was not less than $25 for

---

[7]1,092 Monitoring Contracts multiplied by $25 (the monthly monitoring fee associated with most of such contracts) equals $27,300.  $27,475 – $27,300 = $175.  The additional $175 factored into the net sales price represents the additional $5 monthly monitoring fee for several of the Monitoring Contracts, *see* supra n. 3; $175 divided by $5 = 35, which means that the monthly monitoring fee for apparently 35 of the Monitoring Contracts equalled $30.

[8]The $29,753.67 prepayment deduction consisted primarily of unearned revenue.

16

any of the 1,092 Monitoring Contracts,[9] and (b) thus can accept for purposes of resolving the parties' competing summary judgment motions.[10]

Of the 1,092 Monitoring Contracts, (a) 283 dated from (i.e., were thus generated) before August 31, 1999, which is the date of the 1999 Redemption, (b) 693 dated from August 31, 1999, to September 8, 2004,[11] and (c) 114 dated from after September 8, 2004; the dates of the 2 remaining Monitoring Contracts remain an open issue.  Therefore, the Debtor transferred (a) at least 976 Monitoring Contracts to Tepsic by virtue of the September 8, 2004 Transfer (i.e., 283 dated before 8/31/99 plus 693 dated between 8/31/99 and 9/8/04), which

_____

[9]The $497 adjusted average selling price is arrived at by (a) multiplying $25 (monthly monitoring fee) by 1,092 (number of Monitoring Contracts), which product equals $27,300, (b) then multiplying $27,300 by the multiple of 21, which product equals $573,300, (c) then subtracting $29,753.67 (the prepayment deduction) from $573,300, which yields $543,546.33, (d) then dividing $543,546.33 by 1,092, which yields $497.75, and (e) then truncating the $.75 from $497.75.

[10]As set forth in the text and the footnotes that precede the instant footnote, the difference between the $497 adjusted average selling price and the $501 actual average selling price is solely attributable to those apparent 35 Monitoring Contracts for which the monthly monitoring fee was $30 rather than $25.  Such 35 Monitoring Contracts were all apparently generated prior to 9/8/04. The Trustee makes a simplifying assumption of a $25 monthly monitoring fee for each of the 1,092 Monitoring Contracts, and thus utilizes a $497 adjusted average selling price for each such contract, because (a) the Trustee, as set forth below, attempts, in each of his first 4 counts, to recover the value for a different portion of the 976 Monitoring Contracts that were generated prior to 9/8/04, see infra St. of Lit. (pt. I), and (b) the Trustee, in order to conveniently assign a value to each such portion, needs an adjusted average selling price for each Monitoring Contract.

[11]Of the 693 Monitoring Contracts created between August 31, 1999, and September 8, 2004, 401 were created between March 31, 2002, and September 8, 2004.  Furthermore, 39 of such 401 Monitoring Contracts were created between June 22, 2004, and September 8, 2004.

contracts were then ultimately conveyed by Tepsic to VSI, and (b) at least 114 Monitoring Contracts to Tepsic via the Post-September 8, 2004 Transfer, which contracts were then ultimately sold by Tepsic to VSI.

On June 22, 2005, the Debtor filed a voluntary petition in bankruptcy under Chapter 11.  The Debtor ceased all business operations on July 25, 2005, and on August 19, 2005, the instant bankruptcy case was converted from one under Chapter 11 to one under Chapter 7.  When the Debtor filed for bankruptcy on June 22, 2005, it had, according to its filed bankruptcy schedules, assets of $4,000 ($3,000 in cash on deposit in a bank and $1,000 in monitoring equipment) and liabilities of $281,000.  According to the claims register in the instant bankruptcy case, the actual amount of unsecured claims (priority and general unsecured) is over $420,000.

## STATEMENT OF THE INSTANT LITIGATION

The Trustee commenced the instant adversary proceeding by filing a two-count complaint (Doc. #1), wherein he (a) seeks, via Count 1, to avoid as fraudulent the transfers of property by the Debtor to Tepsic that occurred via the 1999 Redemption, the September 8, 2004 Transfer, and the Post-September 8, 2004 Transfer, and (b) seeks, via Count 2, to avoid as preferential the September 8, 2004 Transfer.  Subsequently in his Response to Defendant's Motion for Summary Judgment (Doc. #27), the Trustee clarified the aforesaid two counts, for ease of analysis and resolution, by breaking them out into what the Trustee calls seven overlapping counts.  The Court will henceforth handle the Trustee's complaint as one that includes the seven counts as so designated by the Trustee

18

in such response.

I.      **The Trustee's First 4 Counts.**

The Trustee's characterization of such seven counts as overlapping is accurate, the Court finds, because, for instance, the Trustee, in the first four of such counts, seeks to avoid as preferential the same transfer, to wit the Debtor's transfer of the 976 Monitoring Contracts conveyed to Tepsic by virtue of the September 8, 2004 Transfer, but in ever-declining portions of such 976 Monitoring Contracts as follows:

(a)     Count 1 – avoidance of the transfer of all of such 976 Monitoring Contracts, 283 of which were created before August 31, 1999 (i.e., the date of the 1999 Redemption), and 693 of which were created after such date and before September 8, 2004, which avoidance, the Trustee contends, entitles him to a recovery of $485,072 [i.e., 976 contracts x $497 sale price that VSI ultimately paid for such contracts],

(b)     Count 2 – avoidance of the transfer of 693 of such 976 Monitoring Contracts, which 693 were created between August 31, 1999, and September 8, 2004, which avoidance, the Trustee contends, entitles him to a recovery of $344,421 [i.e., 693 contracts x $497 sale price to VSI],

(c)     Count 3 – avoidance of the transfer of 401 of such 976 Monitoring Contracts, which 401 were created between March 31, 2002, and September 8, 2004, which avoidance, the Trustee contends, entitles him to a recovery of $199,297 [i.e., 401 contracts x $497 sale price], and

(d)     Count 4 – avoidance of the transfer of 39 of such 976 Monitoring

19

Contracts, which 39 were created between June 22, 2004, and September

8, 2004, which avoidance, the Trustee contends, entitles him to a recovery

of $19,383 [i.e., 39 contracts x $497 sale price].

The Trustee's purpose in so breaking out such preference action is that he

identifies four discrete methods for prevailing on such action – and, in particular,

four discrete methods for satisfying 11 U.S.C. § 547(b)(5) (i.e., the preference

requirement that the creditor receive more than he would have if such transfer

had not been made and he were paid in accordance with a Chapter 7

distribution) – each of which, if he is successful therewith, would result in the

avoidance of differing portions of the transfer of the 976 Monitoring Contracts via

the September 8, 2004 Transfer.  Of course, and as can be readily seen, if the

Trustee prevails on Count 1, then Counts 2 – 4 are rendered moot; if the Trustee

cannot so prevail but he nevertheless prevails on Count 2, then Counts 3 and 4

are rendered moot; and so on.

In the Trustee's Count 1, the Trustee contends that, for purposes of

§ 547(b)(5), Tepsic's receipt of the 976 Monitoring Contracts that he obtained via

the September 8, 2004 Transfer allowed him to receive more than he would have

gotten had such transfer not occurred and he received instead only what he

would have gotten via a Chapter 7 distribution.  The Trustee so argues because,

he argues in turn, in such latter event he would have been able to successfully

obtain from the Court, via 11 U.S.C. § 510(c), an equitable subordination of

Tepsic's security interest in such contracts – actually, to be more precise, the

Trustee contends that Tepsic's secured claim would have been equitably

20

subordinated to all other allowed claims.  In the Trustee's Count 2, the Trustee

contends alternatively (i.e., that is, if such foregoing equitable subordination

would not succeed) that, for purposes of § 547(b)(5), at least Tepsic's receipt of

the 693 Monitoring Contracts that were created between August 31, 1999, and

September 8, 2004, which contracts he obtained as part of the September 8,

2004 Transfer, allowed him to receive more than he would have gotten had such

transfer not occurred and he received instead only what he would have gotten via

a Chapter 7 distribution.  The Trustee so argues because, he argues in turn, in

such latter event he would have been able to successfully establish that Tepsic

did not have a security interest at all in any of such 693 contracts.[12]  In the

Trustee's Count 3, the Trustee contends alternatively (i.e., that is, if such

foregoing equitable subordination were to fail and Tepsic were determined to

have had a security interest in the aforesaid 693 Monitoring Contracts) that he

can satisfy § 547(b)(5) with respect to at least the 401 Monitoring Contracts that

were created between March 31, 2002, and September 8, 2004, that Tepsic

received via the September 8, 2004 Transfer.  The Trustee so argues because,

he argues in turn, Tepsic's taking of a security interest in such contracts could

have been successfully avoided as a fraudulent conveyance.  Finally in the

Trustee's Count 4, the Trustee contends alternatively (i.e., that is, if he were to

lose on each of his first three counts) that he can satisfy § 547(b)(5) with respect

---

[12]The Trustee concedes that Tepsic had a security interest in the 283
Monitoring Contracts that were created before August 31, 1999 (i.e., the date of
the 1999 Redemption).

21

to at least the 39 Monitoring Contracts that were created between June 22, 2004,

and September 8, 2004, that Tepsic received via the September 8, 2004

Transfer.  The Trustee so argues because, he argues in turn, Tepsic, by virtue of

an application of 11 U.S.C. § 547(e)(3) to the instant matter, did not obtain any

security interest in such contracts until such contracts were created, that is

subsequent to June 22, 2004, which date falls within one year of the date of the

Debtor's bankruptcy petition filing on June 22, 2005; because such security

interest was itself created within such one year, Tepsic's taking of such security

interest, argues the Trustee, could have been successfully avoided as having

been preferential.

Because the transfers that the Trustee seeks to avoid as preferential in his

first four counts occurred more than 90 days prior to, but within one year of, June

22, 2005, the Trustee, in order to prevail on any of such four counts, must

establish that Tepsic was an insider of the Debtor at the time of such transfers.

The Trustee contends that Tepsic was such an insider.

## II.    The Trustee's Counts 5 – 7.

In Count 5, the Trustee seeks to avoid as a preference the Debtor's

transfer of the 114 Monitoring Contracts conveyed to Tepsic by virtue of the Post-

September 8, 2004 Transfer; because the Post-September 8, 2004 Transfer

occurred, as set forth above, on June 16, 2005, the issue of Tepsic's insider

status for purposes of this count becomes unimportant given that such date was

but six days prior to June 22, 2005.  The Trustee contends that if he prevails on

Count 5, then he is entitled to a recovery of $56,658 [i.e., 114 contracts x $497

22

sale price].  In Count 6, the Trustee seeks to avoid as a fraudulent conveyance a

particular portion – unknown in amount at the present time – of the same

conveyance attacked in his Count 5 (in the event that he ultimately does not

prevail on his Count 5), namely that portion of such 114 Monitoring Contracts

which were not actually generated by Tepsic.  Finally, in Count 7 the Trustee

attacks as a fraudulent conveyance all of the transfers made by the Debtor to

Tepsic that occurred via the 1999 Redemption (such as, for instance, the

$986,013.34 worth of Redemption Price monthly instalment payments made by

the Debtor to Tepsic between October 1999 and September 2004), but with the

caveat, according to the Trustee, that he is insulated from the 4-year statute of

limitations that generally pertains to a Pennsylvania fraudulent conveyance action

that would be brought by a bankruptcy trustee via 11 U.S.C. § 544(b) by virtue of

his being able to step into the shoes of the U.S. Internal Revenue Service (as a

creditor of the Debtor).

## III.    The Parties' Summary Judgment Motions.

Tepsic moves for summary judgment in his favor on all seven of the

Trustee's counts, which motion is, not surprisingly, opposed by the Trustee.  The

Trustee moves for summary judgment on the first five of his seven counts, which

motion, as one would expect, is opposed by Tepsic; the Trustee does not move

for summary judgment on his Counts 6 and 7 because he contends that genuine

factual disputes exist regarding the same.

As an initial matter, the Court will summarily deny without prejudice

Tepsic's summary judgment motion as it pertains to Count 7.  The Court will so

rule – that is, deny such portion of such motion and without any real discussion –
primarily because (a) the Trustee indicated at the last hearing on the parties'
summary judgment motions, that is the hearing on January 11, 2007, that, if the
Trustee were to prevail with respect to the relief that he seeks via his first six
counts, then he would likely terminate his pursuit of the relief sought via (i.e.,
withdraw) Count 7, (b) the Trustee, as set forth below, will prevail at this time with
respect to the relief that he seeks via his first four counts, (c) the Trustee's
Counts 5 and 6, as also set forth below, will survive summary judgment and,
thus, will proceed to trial, and (d) a strong possibility thus exists that the
resolution of Count 7 will ultimately be rendered moot.  However, the Court
summarily adds that factual issues remain regarding Count 7, and that it remains
unconvinced, at least somewhat so at this time, as to the viability of Tepsic's
statute of limitations defense thereto.

      For the reasons set forth in the ensuing Discussion, the Court shall grant
the Trustee's summary judgment motion as it pertains to both Counts 1 and 2;
the Court technically need only grant such relief with respect to Count 1 given
that the relief which is sought therein (i.e., the avoidance of the transfer, and then
the recovery, of 976 Monitoring Contracts with a total value of $485,072)
encapsulates that which is sought via Count 2 (i.e., the avoidance of the transfer,
and then the recovery, of 693 of such 976 contracts with a total value of
$344,421) but the Court nevertheless wishes to write on, and then rule with
respect to, both such counts.  Because the Trustee shall prevail on Counts 1 and
2, the Court necessarily shall deny with prejudice Tepsic's summary judgment

24

motion as it pertains to such counts.  As for Counts 3 and 4, since the relief

sought in Count 1 (and, for that matter, Count 2) encapsulates that which is

sought via Counts 3 and 4, and given that the Trustee shall prevail on both

Counts 1 and 2, the Court shall deny as moot both parties' summary judgment

motions as they pertain to Counts 3 and 4.  Finally, with respect to Counts 5 and

6, the Court shall deny without prejudice both parties' summary judgment

motions as they pertain to Count 5, and shall deny without prejudice Tepsic's

summary judgment motion as the same pertains to Count 6; the Court so rules

because, as set forth above in the Statement of Facts, a genuine factual dispute

exists which the Court finds is material to a resolution of Counts 5 and 6, namely

what Tepsic was to actually receive – vis-a-vis the 114 Monitoring Contracts that

the Debtor conveyed to Tepsic by virtue of the Post-September 8, 2004 Transfer

– by virtue of the alleged oral contract that he supposedly entered into with

Duvall and the Debtor on or about September 15, 2004, *see* <u>supra</u> St. of Facts

(pt. III).

## **<u>DISCUSSION</u>**

The Court need only discuss further the Trustee's first two preference

counts, that is the Trustee's Counts 1 and 2.  The Court will resolve each such

count in inverse order, that is the Court will first address Count 2, then move on

to Count 1.

## I.    **<u>The Trustee's Count 2.</u>**

In Count 2, the Trustee seeks to avoid as preferential the Debtor's transfer

to Tepsic of the 693 Monitoring Contracts that were created between August 31,

1999, and September 8, 2004 (hereafter "the 693 Monitoring Contracts"), which

contracts were transferred by virtue of the September 8, 2004 Transfer.  Count 2

is the count wherein the Trustee contends that (a) Tepsic lacked a security

interest in the 693 Monitoring Contracts, and (b) he can, as a result of such lack

of a security interest, satisfy § 547(b)(5) with respect to the September 8, 2004

Transfer of the 693 Monitoring Contracts.

11 U.S.C. § 547(b) provides, in pertinent part, that:

Except as provided in subsection[] (c) ... of this section,

[which subsection provides various preference defenses none of

which Tepsic has sought to avail himself of,] the trustee may avoid

any transfer of an interest of the debtor in property —

(1)     to or for the benefit of a creditor;

(2)     for or on account of an antecedent debt owed by the

debtor before such transfer was made;

(3)     made while the debtor was insolvent;

(4)     made —

(A) on or within 90 days before the date of the filing of

the petition; or

(B) between ninety days and one year before the date

of the filing of the petition, if such creditor at the time

of such transfer was an insider; and

(5)     that enables such creditor to receive more than such

26

creditor would receive if —

(A)  the case were a case under chapter 7 of this title;

(B)  the transfer had not been made; and

(C)  such creditor received payment of such debt to

the extent provided by the provisions of this title.

11 U.S.C.A. § 547(b) (West 2004 & Supp. 2006).

### A.     Whether the transfer of the 693 Monitoring Contracts constitutes a "transfer" for purposes of § 547(b)?

The parties quarrel at length over whether the September 8, 2004

Transfer of the 693 Monitoring Contracts constitutes a "transfer" of the Debtor's

property within the meaning of § 547(b).  Tepsic predicates his position that such

transaction did not constitute such a "transfer" solely on his position, in turn, that

(a) he possessed a security interest in the 693 Monitoring Contracts on

September 8, 2004, (b) he obtained such security interest back on August 31,

1999, (c) he merely executed on such security interest when he obtained such

contracts via the September 8, 2004 Transfer, (d) an execution upon a security

interest, as a matter of law, at least for preference purposes, is deemed not to

constitute a "transfer" within the meaning of § 547(b), and (e) the only "transfer,"

instead, that is deemed to have occurred for purposes of § 547(b), as a matter of

law, is the acquisition of such security interest, which acquisition in this case, as

just set forth, occurred on August 31, 1999, which date is substantially (i) prior to

September 8, 2004, and (ii) outside of the one-year period prior to the June 22,

2005 commencement of the instant bankruptcy case.  For the proposition that an

27

execution upon a security interest does not constitute a "transfer" for purposes of § 547(b), and that the only "transfer" that is deemed to occur for such purposes arises as of the date upon which such security interest is first obtained, Tepsic relies on the decision in In re Le Café Creme, Ltd., 244 B.R. 221 (Bankr.S.D.N.Y. 2000).

The Trustee disagrees with Tepsic's position that an execution upon a security interest does not constitute a "transfer" for purposes of § 547(b). The Court disagrees as well. However, the Court need not discuss the particulars of its disagreement with such position until it addresses the Trustee's Count 1 given that an alternative rationale exists for deciding the "transfer" issue in Count 2 against Tepsic, which rationale can be more readily explained. In particular, Tepsic's foregoing position is only viable if he actually had the security interest in the 693 Monitoring Contracts that he claims to have had. Unfortunately for Tepsic, however, the Court, as set forth below, concludes, as a matter of law, that Tepsic did not possess such security interest, *see* infra Disc. (pt. I. E (i)). Without such security interest, of course, Tepsic's position fails. Furthermore, the law is clear – and, in any event, the Court holds as a matter of law – that the seizure of property of a debtor pursuant to a security interest which is unperfected or, even worse, which is determined not to exist at all, constitutes a "transfer" for purposes of § 547(b). *See* In re Chapman, 113 B.R. 561, 564 (Bankr.N.D. 1990); In re Beck, 25 B.R. 947, 951 (Bankr.N.D.Ohio 1982); In re Brown, 18 B.R. 956, 959 (Bankr.S.D.Ill. 1982). Therefore, the September 8, 2004 Transfer of the 693 Monitoring Contracts constitutes a "transfer" of the

28

Debtor's property within the meaning of § 547(b).

**B.**     **The transfer of the 693 Monitoring Contracts and § 547(b)(1) & (b)(2).**

The Court does not understand Tepsic to dispute that, if the September 8, 2004 Transfer of the 693 Monitoring Contracts constitutes a "transfer," the same (a) was made to him in his status as a creditor of the Debtor, thereby satisfying § 547(b)(1), and (b) was made on account of an antecedent debt, namely the balance due under the Promissory Note, thereby satisfying § 547(b)(2). However, if Tepsic disagrees with the foregoing propositions, such disagreement is to no avail because the Court finds that § 547(b)(1) & (2) are satisfied, as a matter of law, as just set forth.

**C.**     **The transfer of the 693 Monitoring Contracts and § 547(b)(3).**

The Court is uncertain whether Tepsic disputes the Trustee's assertion that the Debtor was insolvent when the September 8, 2004 Transfer was made. The term "insolvent," which appears in § 547(b)(3), means, with respect to a debtor that is a corporation, "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of – (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors."  11 U.S.C.A. § 101(32)(A) (West 2004).  "Unlike property transferred with actual intent to defraud, hinder or delay the debtor's creditors, property transferred as payment or security for a valid, although antecedent, debt is to be considered as part of the debtor's assets in determining the debtor's solvency at that time."  5 Collier on Bankruptcy ¶ 547.03[5] at 547-38

29

(Bender 2006); *see also* In re K & R Mining, Inc., 103 B.R. 136, 140 (Bankr.N.D.

Ohio 1988) (same). "[T]he debt that was to be extinguished by such transfer is

also to be included in determining the debtor's liabilities." K & R Mining, 103 B.R.

at 140. "For the purposes of ... section [547], the debtor is presumed to have

been insolvent on and during the 90 days immediately preceding the date of the

filing of the petition." 11 U.S.C.A. § 547(f) (West 2004 & Supp. 2006). However,

"this presumption [of insolvency] does not work in th[e] case ... [where the]

transfer of funds took place more than ninety (90) days prior to filing and involves

an insider," In re Perry, 158 B.R. 694, 697 (Bankr.N.D.Ohio 1993); in such a

case, therefore, the bankruptcy trustee bears the burden of affirmatively proving

a debtor's insolvency, *see* Id. Accordingly, the Trustee cannot take advantage of

an insolvency presumption regarding the September 8, 2004 Transfer.

Nevertheless, the Court concludes, as a matter of law, that the Debtor was

insolvent when the September 8, 2004 Transfer was made given, as set forth

above, that (a) after such transfer the Debtor's liabilities far exceeded its assets,

*see* supra St. of Facts (pt. II), and (b) the amount of the debt satisfied by such

transfer – i.e., $1,117,548.54, that is the amount due under the Promissory Note,

*see* supra St. of Facts (pt. II) – far exceeded the value of the property so

transferred – i.e., all of the 976 Monitoring Contracts so transferred, which

contracts were roughly worth $485,072 (the sales price to VSI that the Trustee

arrives at in the instant proceeding), *see* supra St. of Facts (pt. IV) & St. of Lit.

30

(pt. I).[13]

**D.** **The transfer of the 693 Monitoring Contracts and § 547(b)(4).**

The Trustee can satisfy § 547(b)(4) vis-a-vis the September 8, 2004

Transfer if Tepsic was an insider at the time of such transfer given that

September 8, 2004, falls within the one year period that precedes June 22, 2005

(i.e., the date upon which the Debtor filed its bankruptcy petition). Tepsic

disputes that he was an insider on September 8, 2004.

The term "insider," which appears in § 547(b)(4)(B), includes an "affiliate."

11 U.S.C.A. § 101(31)(E) (West 2004). The term "affiliate," which appears in

§ 101(31)(E), means, among other things, an

(A) entity that directly or indirectly owns, controls, or holds with

power to vote, 20 percent or more of the outstanding voting

securities of the debtor, other than an entity that holds such

securities –

(i) in a fiduciary or agency capacity without sole

discretionary power to vote such securities; or

(ii) solely to secure a debt, if such entity has not in fact

exercised such power to vote.

11 U.S.C.A. § 101(2) (West 2004). "Ordinarily, 'determination of insider status is

a question of fact,'" In re Enterprise Acquisition Partners, Inc., 319 B.R. 626, 630

---

[13]The only other property transferred via the September 8, 2004 Transfer
was a negligible amount of accounts receivable and some 800 telephone
numbers.

(B.A.P. 9th Cir. 2004), "that is made on a case-by-case basis, after the consideration of various [relevant] factors." In re Schuman, 81 B.R. 583, 586 n.1 (B.A.P. 9th Cir. 1987). "Nevertheless, where the [relevant] underlying facts are undisputed, a trial court is free, on a motion for summary judgment, to determine whether the established facts satisfy the statutory standard. In this sense, it would be more accurate to consider the insider determination as a mixed question of law and fact," Id., which question can be decided on a motion for summary judgment, Enterprise Acquisition Partners, 319 B.R. at 630.

The Court holds, as a matter of law, that Tepsic was an affiliate, and thus an insider, of the Debtor on September 8, 2004, because, on that date, he directly held, with the power to vote, 100 percent of the outstanding voting stock of the Debtor – that is, the 51 remaining outstanding shares of voting stock in the Debtor which was, at the time, owned by Duvall – by virtue of the Pledge Agreement and the Proxy; true, such 51 shares of stock (with the power to vote the same) were thereby held by Tepsic to secure (arguably solely to secure) the debt of the Debtor under the Promissory Note,[14] but Tepsic cannot avail himself of the "affiliate" exception contained in § 101(2)(A)(ii) because he had, in fact, previously exercised his power to vote via the Proxy on August 31, 1999, when he thereby elected Duvall to be the sole director of the Debtor, see supra St. of Facts (pt. I) (discussing Def's. Mot. Summ. J. (Doc. #17) Ex. N ("Action in Writing

---

[14]Duvall's 51 shares of stock in the Debtor were actually held by Tepsic to secure all of the various obligations under the Promissory Note, including the payment obligation thereunder.

in Lieu of a Special Meeting of Shareholders")).[15]

### E.    The transfer of the 693 Monitoring Contracts and § 547(b)(5).

The parties hotly contest whether the September 8, 2004 Transfer of the

693 Monitoring Contracts satisfies § 547(b)(5).  The Trustee contends that

§ 547(b)(5) is so satisfied because, as set forth above, the Trustee argues, in

turn, that (a) Tepsic lacked a security interest in the 693 Monitoring Contracts,

and (b) Tepsic's receipt of the 693 Monitoring Contracts via the September 8,

2004 Transfer thus allowed him to receive more than he would have gotten had

such transfer not occurred and he received instead only what he would have

gotten via a Chapter 7 distribution.  Tepsic disagrees with the Trustee for two, if

not perhaps three, discrete reasons.  First, Tepsic argues that he possessed a

security interest in the 693 Monitoring Contracts; if Tepsic is correct, then, of

course, such fact would operate to flatly defeat the Trustee's preference action in

Count 2.  Second, Tepsic appears to argue, as a basis for defeating the

Trustee's § 547(b)(5) position, that, even if he did not possess such a security

interest, he nevertheless obtained an assignment of such contracts on August

31, 1999, by virtue of the parties' execution of the Assignment of Accounts

Receivable.  Third, Tepsic argues that, even if he lacked such a security interest,

---

[15]The Court also summarily holds, as a matter of law, that Tepsic was a
"nonstatutory insider," if not a person in control and thus thereby a statutory
insider (i.e., via § 101(31)(B)(iii)), of the Debtor on September 8, 2004, by virtue
of the numerous restraints that were then contained in the 949 Stock Sale
Agreement, the Pledge Agreement, and the Proxy; such restraints are set out in
detail in footnote 3 of the Trustee's "Brief in Support of Response to Defendant's
Motion for Summary Judgment *and* In Support of Plaintiff's Counter Motion for
Partial Summary Judgment" (Doc. #28).

the transfer to him of the 693 Monitoring Contracts did not preferentially benefit

him (i.e., allow him to receive more than ...) because, he argues in turn, such

contracts were "worthless shells" when they were transferred to him; Tepsic's

"worthless shell" argument is predicated upon his position that the Debtor had,

back on August 31, 1999, by way of the Assignment of Accounts Receivable,

assigned to him – and thus stripped away from the 693 Monitoring Contracts – all

of the future income stream that was to be generated by such contracts.

As an initial matter of nomenclature, "[a] creditor's receiving more from the

transfer than she would have received in a Chapter 7 liquidation[, absent such

transfer,] is often referred to as 'preferential effect.'"  D. Epstein, S. Nickles & J.

White, Bankruptcy Practitioner Treatise Series § 6-20 at 577 (West 1992).  For

the sake of convenience, the Court will henceforth refer to the same as

"preferential effect."  "In the case of a ... [property transfer by the Debtor] to an

unsecured, nonpriority (general) creditor, the preferential effect requirement [of

§ 547(b)(5)] is satisfied unless general, unsecured creditors would have received

100% of their claims in the hypothesized Chapter 7 distribution."  Id. at 580 (citing

numerous cases in footnote 17).  As set forth above, the Debtor had but $4,000

of assets when it filed for bankruptcy, which amount is far less than that which is

owed to general unsecured creditors in the instant case, see supra St. of Facts

(pt. IV); consequently, such general, unsecured creditors will not receive – at

least absent a recovery by the Trustee in the instant adversary proceeding –

100% of their claims in a hypothesized Chapter 7 distribution.  Furthermore,

Tepsic fails to even argue, let alone allege a basis for arguing, that he would

have been a priority creditor vis-a-vis any of the Debtor's other creditors had the

September 8, 2004 Transfer not occurred and, instead, what ensued was a

hypothesized Chapter 7 liquidation.  Therefore, the September 8, 2004 Transfer

of the 693 Monitoring Contracts had preferential effect such that it satisfies

§ 547(b)(5) unless either (a) Tepsic had a security interest in such contracts, (b)

he received an assignment of such contracts so as to preclude a finding of

preferential effect, or (c) such contracts were "worthless shells."  In establishing

preferential effect, a bankruptcy trustee is free to, among other things, attack a

creditor's putative lien as nonexistent or worthless, or as one that may be

avoided in bankruptcy.  *See* Id. at 582-83 (citing numerous cases in footnotes 20

& 22).

### (i)    Whether Tepsic had a security interest in the 693 Monitoring Contracts?

Tepsic argues that the Debtor, by virtue of the Security Agreement,

unambiguously granted to him a security interest in the 693 Monitoring Contracts,

which contracts, as set forth above, were all created after August 31, 1999, *see*

supra Disc. (pt. I).  Tepsic so argues because, he contends in turn, the Debtor,

by virtue of the Security Agreement, unambiguously granted to him not only a

security interest in those Monitoring Contracts that were then in existence on

August 31, 1999 (i.e., a total of 283 Monitoring Contracts) – which date is when

the Security Agreement was executed – but also a security interest in those

Monitoring Contracts that were created thereafter.  As a ground for such

argument, Tepsic points to the following language in the Security Agreement, to

35

wit (1) "a) *All* monitoring accounts and contracts" (emphasis added), and (2) the

language that begins with "together with all accessions, parts, accessories, ..."

and ends with "replacements and additions thereto, and the proceeds (cash and

non-cash) of all the foregoing."  The Court agrees with Tepsic that the foregoing

language in the Security Agreement is unambiguous, but the Court construes the

same language unambiguously such that the Debtor did not thereby grant to

Tepsic a security interest in Monitoring Contracts that were created after August

31, 1999, that is the date upon which the Security Agreement was executed; put

differently, the Court construes the foregoing language such that it

unambiguously does not constitute an "after-acquired property clause."  Quickly,

the Court so rules because (a) the word "All" refers only to all Monitoring

Contracts in existence when the Security Agreement was executed, and (b) each

of the terms that are contained in the other language upon which Tepsic relies,

such as the terms "accessions" and "additions," must – in order for each of the

terms to then be applied consistently among each other – refer, for instance

when applied to the 283 Monitoring Contracts then in existence, each particular

such Monitoring Contract rather than the fleet of such contracts.

Tepsic next argues (a) that under Pennsylvania law, pursuant to the Third

Circuit's decision in In re Bollinger Corporation, 614 F.2d 924 (3rd Cir. 1980), a

court, when determining whether a debtor has granted a security interest to a

creditor in particular collateral, may generally consider any and all of the

documents that were signed by the parties that might arguably bear on the issue

as to whether the parties intended to create a security interest in such collateral,

36

(b) that this Court, therefore, is obligated to consider other documents that were

executed between the Debtor and Tepsic that bear on the parties' intent to create

a security interest in the 693 Monitoring Contracts, (c) that, if this Court considers

a number of the documents between the parties in addition to the Security

Agreement including, in particular, the August 16, 1999 Action in Writing, the 949

Stock Sale Agreement, the 51 Stock Sale Agreement, and the Assignment of

Accounts Receivable, then the Court should conclude that the parties intended to

create a security interest in the 693 Monitoring Contracts, and (d) that, in light of

the foregoing, he possessed a security interest in the 693 Monitoring Contracts.

The Court agrees with Tepsic that certain of the other documents that he calls to

the attention of the Court, namely the August 16, 1999 Action in Writing, the 949

Stock Sale Agreement, and the 51 Stock Sale Agreement, support his position

regarding an intent to create a security interest in the 693 Monitoring Contracts.[16]

Unfortunately for Tepsic, however, the Court is not free under Pennsylvania law,

as he argues, to consider such documents when ascertaining whether he

possessed a security interest in the 693 Monitoring Contracts.  The Court so

rules for several reasons.

First, Tepsic misstates Pennsylvania law and, in particular, the decision in

Bollinger when he argues that the Bollinger court held that a court, when it

---

[16]As set forth in the immediately preceding textual paragraph, the Court
disagrees with Tepsic that the Security Agreement supports his position
regarding such intent.  As set forth below, the Court also disagrees with Tepsic
that the Assignment of Accounts Receivable supports his position regarding such
intent, see infra Disc. (pt. I. E (ii)).

37

determines whether a particular security interest exists, may *generally* consider any executed document that bears on, that is which is indicative of, the parties' intent to create such security interest.  What the Bollinger court, in fact, held was that, "*[w]hen the parties have neglected to sign a separate security agreement*, ... [ then a court should] look at the transaction as a whole in order to determine if there is a writing, or writings, signed by the debtor describing the collateral which demonstrates an intent to create a security interest in the collateral." Bollinger, 614 F.2d at 928 (emphasis added).  Thus, under Pennsylvania law, if parties have executed a separate security agreement, then a court is not *generally* free to look outside such document when endeavoring to ascertain whether a particular security interest has been created.  *See* In re Main, Inc., 1999 WL 689715 at 4-5 (E.D.Pa. 1999) (citing three Pennsylvania bankruptcy court decisions); *accord* In re H & I Pipe and Supply Co., Inc., 44 B.R. 949, 950-952 (Bankr.M.D.Tenn. 1984) (agreeing with, but similarly distinguishing, the Bollinger decision when finding Tennessee law); In re Martin Grinding & Machine Works, Inc., 793 F.2d 592, 594-595 (7th Cir. 1986), *aff'g* 42 B.R. 888, 890-892 (Bankr.N.D.Ill. 1984) (agreeing with, but similarly distinguishing, Bollinger when finding Illinois law).  The Debtor and Tepsic executed the Security Agreement; consequently, the Court is not *generally* free to consider, for instance, the August 16, 1999 Action in Writing, the 949 Stock Sale Agreement, or the 51 Stock Sale Agreement, when determining whether the parties created a security interest in the 693 Monitoring Contracts.

Second, this Court can accept that courts, when they undertake to

38

determine whether parties have created a security interest in particular collateral, are free to look outside of a security agreement at other documents if such other documents are referenced in such security agreement's description of collateral. *See* In re Product Design and Fabrication, Inc., 182 B.R. 803, 806 (Bankr.N.D.Iowa 1994) (citing decisions from the 8th, 9th, and 10th Circuits). Unfortunately for Tepsic, however, the description of collateral contained in the Security Agreement fails to include a reference to any document outside of the Security Agreement.

Third, this Court is cognizant of the general rule that courts, when they undertake to determine whether parties have created a security interest in particular collateral, are free to look at documents outside of a security agreement if the security agreement is itself ambiguous; such general rule is but an extension of the parol evidence rule.  *See* FD & S v. U.S., 574 F.Supp. 699, 703 (S.D.W.Va. 1983) ("when language in a security agreement is ambiguous on its face, parol evidence is admissible in determining the meaning given to it by the parties to the agreement"); Martin Grinding, 793 F.2d at 595 ("parol evidence cannot enlarge an unambiguous security agreement"); In re Swearingen, 27 B.R. 379, 382-383 (Bankr.D.Kan. 1983).  Unfortunately for Tepsic, however, the relevant language in the Security Agreement is, as set forth above, unambiguous, and it unambiguously did not grant to Tepsic a security interest in the 693 Monitoring Contracts; therefore, the aforesaid extension of the parol evidence rule is of no use to Tepsic.  Furthermore, and perhaps equally important, even if the Security Agreement were determined to be ambiguous vis-

39

a-vis whether it created a security interest in after-acquired contracts – i.e., the

693 Monitoring Contracts, each of which was created after the date of the

execution of the Security Agreement – so as to warrant an application of the

aforesaid extension of the parol evidence rule and thus allow resort to documents

outside of the Security Agreement, this Court nevertheless may not consider

such parol evidence in light of the Third Circuit's decision in In re Middle Atlantic

Stud Welding Co., 503 F.2d 1133 (3rd Cir. 1974).  The Third Circuit in Middle

Atlantic held – contrary to what the parol evidence would seem to generally

dictate – that, if a separate security agreement exists and the same is ambiguous

vis-a-vis whether it creates a security interest in after-acquired property, then (a)

a court's analysis is complete, that is such court may not resort to parol evidence,

be it written or oral, to clarify such ambiguity, and (b) a decision is compelled to

the effect that a security interest does not exist in after-acquired property.  *See*

Middle Atlantic, 503 F.2d at 1136;[17] *see also* In re Engle, 93 B.R. 58, 60 (E.D.Pa.

1987) (similarly interpreting the holding in Middle Atlantic).  The Third Circuit's

decision in Middle Atlantic, consequently, forecloses resort by the Court to the

---

[17]Interestingly, the Third Circuit in Middle Atlantic also pointed out, at the beginning of its decision therein, that both lower courts found that the parties therein, in fact, intended the security agreement in question to create a security interest in after-acquired accounts receivable.  *See* Middle Atlantic, 503 F.2d at 1135.  Notwithstanding such finding of such intent, such lower courts – each of which ruled in the same manner as did the Third Circuit – ruled that a security interest was not created in after-acquired accounts receivable, which ruling necessarily means that such courts, as well as the affirming Third Circuit, disallowed parol evidence (which, of course, would have helped the purported secured creditor) to clarify any ambiguity as to whether such security interest was created.

parol evidence that Tepsic would have the Court consider when entertaining his position that he possessed a security interest in after-acquired contracts (i.e., the 693 Monitoring Contracts).

The Third Circuit's decision in <u>Middle Atlantic</u>, as well, provides a readily-apparent alternative ground for the Court's decision that Tepsic lacked a security interest in the 693 Monitoring Contracts.  As just set forth, <u>Middle Atlantic</u> compels a ruling that Tepsic lacked a security interest in the 693 Monitoring Contracts if the Security Agreement was ambiguous vis-a-vis whether it created a security interest in after-acquired contracts.  Because the Court holds that, under a best-case scenario for Tepsic, the Security Agreement was so ambiguous, Tepsic lacked a security interest in the 693 Monitoring Contracts in any event.  The Court holds that Tepsic's best-case scenario is that the Security Agreement was so ambiguous because the Court could not possibly construe the Security Agreement such that it is both unambiguous and that it grants to Tepsic a security interest in after-acquired contracts (i.e., the 693 Monitoring Contracts).[18]

Therefore, Tepsic did not possess a security interest in the 693 Monitoring Contracts when they were conveyed to him via the September 8, 2004 Transfer.

**(ii)      Whether Tepsic received an assignment of the 693 Monitoring Contracts?**

_____

[18]To remind, the Court construes the Security Agreement such that it unambiguously did not grant to Tepsic a security interest in the 693 Monitoring Contracts.

41

Tepsic also argues, it would appear, that, even if the Court is not free to

consider all of the parol evidence outside of the Security Agreement that he

would wish to rely upon so as to establish that he possessed a security interest in

after-acquired contracts (i.e., the 693 Monitoring Contracts), he nevertheless

obtained an assignment of such contracts on August 31, 1999, by virtue of the

parties' execution of the Assignment of Accounts Receivable.  Such apparent

argument by Tepsic fails for several reasons.  First, the Assignment of Accounts

Receivable makes clear that the assignment thereby effectuated was only

collateral in nature, that is the assignment thus effectuated was not outright or

absolute, *see* Def's. Mot. Summ. J. (Doc. #17) Ex. S (Assignment of Accounts

Receivable ¶ 1, "As additional security ... to secure ..., Debtor hereby collaterally

... assigns ... and agrees that Creditor shall have a security interest in ...");

therefore, the Assignment of Accounts Receivable purports to create nothing but

a security interest in that which was thereby collaterally assigned, *see* In re

Delbridge, 61 B.R. 484, 486-487 (Bankr.E.D.Mich. 1986) (citing cases for the

proposition that a collateral assignment constitutes nothing more than the grant

of a security interest); In re Texas Tri-Collar, Inc., 29 B.R. 724, 726

(Bankr.W.D.La. 1983) (same).  Second, because, as already set forth above, the

Court is not free to consider documents outside of the Security Agreement so as

to create a security interest in after-acquired contracts (i.e., the 693 Monitoring

Contracts), *see* supra Disc. (pt. I. E (i)), the Assignment of Accounts Receivable

could not effectively have operated to even collaterally assign after-acquired

contracts (i.e., the 693 Monitoring Contracts), and that is even if such contracts

42

were the subject of such collateral assignment in the first place.  Third, and rather strikingly obvious, what are collaterally assigned by way of the Assignment of Accounts Receivable – or at least that which is thereby purported to be collaterally assigned – are not even any of the Monitoring Contracts themselves (either the 283 in existence on August 31, 1999, or the 693 created thereafter); instead, what is the subject of such collateral assignment is merely *the accounts receivable that were, or were to be, generated by such contracts*.  Consequently, regardless of the relevant law and its application, the Assignment of Accounts Receivable could not possibly have operated to effectuate an assignment, collateral or otherwise, in after-acquired contracts (i.e., the 693 Monitoring Contracts).

### (iii)     Whether the 693 Monitoring Contracts were "worthless shells"?

Proceeding next to Tepsic's "worthless shells" argument, Tepsic argues that all of the after-acquired contracts (i.e., the 693 Monitoring Contracts) were "worthless shells" in any event because the Debtor had, back on August 31, 1999, by way of the Assignment of Accounts Receivable, assigned to him – and thus stripped away from the 693 Monitoring Contracts – all of the future income stream that was to be generated by such contracts.  The Court identifies several fatal flaws in such argument by Tepsic.

First, and as just set forth above, the assignment effectuated by the Assignment of Accounts Receivable was only collateral in nature, *see* supra Disc. (pt. I. E (ii)), which means that such assignment essentially amounted to nothing

43

more than a grant of a security interest in that which was thereby collaterally

assigned; thus, contrary to what Tepsic seems to want to argue, a non-collateral

assignment via the Assignment of Accounts Receivable did not occur.  As just

set forth above, the Assignment of Accounts Receivable represents that the

subject of such collateral assignment is the accounts receivable that were, or

were to be, generated by the Monitoring Contracts themselves (both the 283 that

were in existence on August 31, 1999, and the 693 that were created thereafter),

see supra Disc. (pt. I. E (ii));[19] Tepsic characterizes such accounts receivable as

_____

[19]Tepsic, on page 3 and at footnote 1 of his Supplemental Response to
Plaintiff's Counter Motion for Partial Summary Judgment (Doc. #35), contends (a)
that, by virtue of the Assignment of Accounts Receivable, he thereby became the
owner of all of the benefits of the Monitoring Contracts (i.e., the accounts
receivable that such contracts generated), and (b) that, as a result, the
Monitoring Contracts, by virtue of 11 U.S.C. § 541(d), did not even become
property of the Debtor's bankruptcy estate.  This argument is, to say the least,
somewhat ridiculous because, as things stood when the instant bankruptcy case
was commenced, not even bare legal title to the Monitoring Contracts belonged
to the Debtor's bankruptcy estate (or, for that matter, Tepsic himself) – Tepsic
seized such legal title and then sold such contracts to VSI prior to the
commencement of the instant bankruptcy case.  The Court presumes that what
Tepsic means to argue is that, if such seizure and such sale had not occurred
and the Debtor had filed for bankruptcy, then the Monitoring Contracts would not
have constituted bankruptcy estate property by virtue of § 541(d).  Tepsic is
sorely mistaken, however, because (a) Section 541(d) only applies when a
debtor owns bare legal title to, but not the equitable interest as well in, the
property in question, (b) § 541(d) thus does not apply if such debtor owns the
equitable interest in such property as well, (c) Tepsic, as set forth above,
possessed, by virtue of the Assignment of Accounts Receivable, at best nothing
more than a security interest in accounts receivable, (d) the Debtor, therefore,
would have owned both legal title to, and the equitable interest in, both the
Monitoring Contracts and the accounts receivable that they generated had
Tepsic not seized them on September 8, 2004, and then subsequently sold them
to VSI, and (e) § 541(d), thus, could never have had any application to the
Monitoring Contracts or the accounts receivable that they generated, not even if
Tepsic had not seized and then sold such contracts pre-bankruptcy.

44

the future income stream that was to be generated by such contracts.  The

problem that the Court experiences with a reconciliation of the foregoing is that

(a)     the Assignment of Accounts Receivable thus essentially purports to grant

        to Tepsic a security interest in property certain of which constitutes after-

        acquired property, namely accounts receivable that did not exist as of, but

        which were instead generated after, August 31, 1999,

(b)     such a security interest, that is one in after-acquired property, cannot,

        consistent with the Court's discussion above regarding the grant of a

        security interest in the 693 Monitoring Contracts (which contracts, as set

        forth above, also constitute after-acquired property), be found to have

        been granted via a document other than the Security Agreement, *see*

        supra Disc. (pt. I. E (i)),

(c)     the Security Agreement is, under a best-case scenario for Tepsic,

        ambiguous as to whether it grants to Tepsic a security interest in accounts

        receivable that were generated post-August 31, 1999, by the Monitoring

        Contracts that were created post-August 31, 1999 (i.e., the 693 Monitoring

        Contracts),

(d)     such an ambiguity, as set forth above (i.e., once again, consistent with the

        Court's discussion above regarding the grant of a security interest in the

        693 Monitoring Contracts), is decided against the party asserting a

        security interest, *see* supra Disc. (pt. I. E (i)), which means that Tepsic

        thus lacked a security interest in such future accounts receivable, and

(e)     the Assignment of Accounts Receivable thus could not effectively have

45

operated to even collaterally assign such future accounts receivable (i.e.,

the future income stream that is associated with, that is which is

attributable to, the 693 Monitoring Contracts).

Of course, since the Assignment of Accounts Receivable did not effectively

operate to collaterally assign the future income stream to be generated by the

693 Monitoring Contracts, such future income stream was not, as Tepsic argues,

stripped away from such contracts so as to make them "worthless shells."

Second, and even more problematical for Tepsic, is the fact that the

Assignment of Accounts Receivable, by its precise terms, purports to grant to

Tepsic a security interest in "all of *Debtor's* accounts receivable, including all

sums due ... [*Debtor*] on all monitoring accounts and contracts, now owned or

hereinafter acquired by Debtor" (emphasis added).  Such language poses a

problem for Tepsic's "worthless shells" position because, by virtue of such

granting language, Tepsic could only have conceivably received a security

interest in future accounts receivable of, that is which would be owned by, the

Debtor.  Such language cannot be construed such that Tepsic also was to take a

security interest in future receivables to be generated by the Monitoring

Contracts after the sale of such contracts to an independent third party because,

after such a sale, such future receivables would be those of (i.e., owned by) such

third party rather than those of (i.e., owned by) the Debtor.  Put differently, the

Assignment of Accounts Receivable, by its precise terms, purports to grant to

Tepsic a security interest in – as Tepsic calls it – the future income stream to be

generated by the Monitoring Contracts, but only to the extent that such income

46

stream would constitute property that is owned by the Debtor; such purported

security interest would not have extended to such future income stream to the

extent that such future income stream belonged to an independent third party.

Of course, since the purported security interest in the future income stream to be

generated by the Monitoring Contracts (i.e., the security interest purported to

have been granted by way of the Assignment of Accounts Receivable) would not,

in any event, have extended to such future income stream to the extent that such

future income stream belonged to an independent third party, the grant to Tepsic

of such purported security interest would not have operated to preclude the

Debtor from selling to an independent third party both the Monitoring Contracts

themselves and the future income stream to be generated by such contracts

post-sale.  Consequently, the 693 Monitoring Contracts, had they not been

transferred to Tepsic via the September 8, 2004 Transfer, would have been far

from worthless to either an independent third party purchaser or, therefore, the

Debtor.

Finally, if Tepsic had not seized the 693 Monitoring Contracts on

September 8, 2004, AND even if the Assignment of Accounts Receivable had

effectively operated to collaterally assign, that is to grant a security interest in, the

future income stream to be generated by the 693 Monitoring Contracts, AND

even were the Court to overlook the fact that such a grant, as just set forth in the

last paragraph, could not have operated to preclude the Debtor from selling to an

independent third party both the Monitoring Contracts themselves and the future

income stream to be generated by such contracts post-sale, 11 U.S.C. § 552(a)

47

would have nevertheless operated to (a) effectively terminate such security interest as of, and with respect to – in particular – receivables generated after, the date of the Debtor's bankruptcy petition filing, and (b) thereby defeat Tepsic's "worthless shells" position.  11 U.S.C. § 552(a) provides that "[e]xcept as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."  11 U.S.C.A. § 552(a) (West 2004).  By virtue of § 552(a), any security interest that Tepsic conceivably could have obtained, by way of the Assignment of Accounts Receivable in particular, in the future income stream to be generated by the 693 Monitoring Contracts post-bankruptcy would have been truncated when the Debtor filed for bankruptcy protection.  *See, e.g.,* Delbridge, 61 B.R. at 487; Texas Tri-Collar, 29 B.R. at 725-727.  To complete the analysis, the exception to § 552(a) contained in § 552(b)(1) would have been inapplicable vis-a-vis any security interest that was granted by virtue of the Assignment of Accounts Receivable because (a) such document, in the first place, fails to even provide for a collateral assignment of "proceeds, products, offspring, or profits" of that which was assigned, and (b) accounts receivable that are generated post-bankruptcy, in any event, cannot constitute "proceeds, products, offspring, or profits" of accounts receivable that are generated pre-bankruptcy, *see* Texas Tri-Collar, 29 B.R. at 726-727.

Therefore, the 693 Monitoring Contracts did not constitute "worthless shells" when Tepsic received them by virtue of the September 8, 2004 Transfer.

48

**(iv)**    **§ 547(b)(5) summary.**

Because Tepsic did not possess a security interest in the 693 Monitoring

Contracts when they were conveyed to him via the September 8, 2004 Transfer,

and since the Assignment of Accounts Receivable could not possibly have

operated to effectuate an assignment, collateral or otherwise, in such contracts,

and given that such contracts also did not constitute "worthless shells" when

Tepsic received them by virtue of such transfer, the September 8, 2004 Transfer

of the 693 Monitoring Contracts had preferential effect such that it satisfies

§ 547(b)(5).

**F.**    **Summary of the Trustee's Count 2.**

Because the September 8, 2004 Transfer of the 693 Monitoring Contracts

satisfies all of the elements of a preference under § 547(b), the Trustee may

avoid such transfer as preferential.  Since the 693 Monitoring Contracts were

previously transferred to VSI on June 16, 2005, the Trustee, pursuant to 11

U.S.C. § 550(a)(1), may recover from Tepsic the value of such contracts, which

value, as set forth above, is equal to $344,421, *see* <u>supra</u> St. of Lit. (pt. I).

Therefore, the Court shall grant the Trustee's summary judgment motion as it

pertains to the Trustee's Count 2.

**II.**    **The Trustee's Count 1.**

In Count 1, the Trustee seeks to avoid as preferential the Debtor's transfer

to Tepsic of all of the 976 Monitoring Contracts that were transferred by virtue of

the September 8, 2004 Transfer (hereafter "the 976 Monitoring Contracts").  The

49

976 Monitoring Contracts are comprised of both the 283 that were created before

August 31, 1999 (hereafter "the 283 Monitoring Contracts"), and the 693 that

were created after such date and before September 8, 2004 (i.e., the 693

Monitoring Contracts).  The 693 Monitoring Contracts, as set forth above, also

constitute the subject of the Trustee's successful Count 2; therefore, Count 1

provides the exclusive vehicle by which the Trustee seeks to recover the 283

Monitoring Contracts, as well as an alternative avenue – now no longer

necessary – by which the Trustee can recover the 693 Monitoring Contracts.

Count 1 constitutes the exclusive vehicle by which the Trustee can recover the

283 Monitoring Contracts because (a) Count 2 – in particular, the § 547(b)(5)

element of the preference action pled therein – depends, for its success, upon

the Trustee's position that Tepsic lacked a security interest in the 693 Monitoring

Contracts, and (b) the Trustee, as set forth at footnote 12 above, concedes that

Tepsic had a security interest in the 283 Monitoring Contracts.  Because the

Trustee now only needs Count 1 so as to avoid as preferential the September 8,

2004 Transfer of the 283 Monitoring Contracts, the Court will henceforth refer to

such count as only dealing with such contracts.  In Count 1, the Trustee contends

that the September 8, 2004 Transfer of the 283 Monitoring Contracts had

preferential effect – i.e., he contends that he can satisfy § 547(b)(5) with respect

to such transfer – because, argues the Trustee, had such transfer not occurred,

then he would have been able to successfully obtain from the Court, via 11

U.S.C. § 510(c), an equitable subordination of Tepsic's security interest in such

contracts – actually, to be more precise, the Trustee contends that Tepsic's

secured claim would have been equitably subordinated to all other allowed claims.

As an initial matter, the Court holds that the Trustee satisfies the preference elements of § 547(b)(1) – (4) with respect to Count 1 (i.e., with respect to the transfer of the 283 Monitoring Contracts) for precisely the same reasons, as already set forth above, that such elements are satisfied with respect to Count 2 (i.e., with respect to the transfer of the 693 Monitoring Contracts), *see* supra Disc. (pt. I. B – D).  The only issues that remain for the Court's consideration, therefore, are whether the September 8, 2004 Transfer of the 283 Monitoring Contracts (a) constitutes a "transfer" of the Debtor's property within the meaning of § 547(b), and (b) had preferential effect (i.e., whether the Trustee can satisfy § 547(b)(5) by way of his "equitable subordination" theory).

A.      **Whether the transfer of the 283 Monitoring Contracts constitutes a "transfer" for purposes of § 547(b)?**

A "transfer" is defined under the Bankruptcy Code as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property."  11 U.S.C.A. § 101(54) (West 2004).  "This definition 'is as broad as possible.'  Under the definition, any transfer of an interest in property is a transfer, including a transfer of possession, custody or control even if there is no transfer of title, because possession, custody and control are interests in property."  5 Collier on Bankruptcy ¶ 547.03[1] at 547-15 (citing legislative history); *see also* In re Pearson Industries, Inc., 142 B.R. 831, 840 (Bankr.C.D.Ill. 1992) (same, citing Collier); Le

<u>Café Creme</u>, 244 B.R. at 233 (also citing <u>Collier</u>).

As set forth above in the Court's discussion of Count 2, the Court ruled that the September 8, 2004 Transfer of the 693 Monitoring Contracts constituted, for purposes of § 547(b), a "transfer" of the Debtor's property (a) because, even presuming *arguendo* – as Tepsic argues – that an execution upon a security interest does not constitute a "transfer" for purposes of § 547(b), Tepsic lacked a security interest in such contracts as of September 8, 2004, that could have been executed upon, and (b) since the seizure of property by one for whom such property is not collateral constitutes a "transfer" within the meaning of § 547(b). *See* <u>supra</u> Disc. (pt. I. A).  The basis for such ruling – i.e., that Tepsic lacked a security interest in the 693 Monitoring Contracts – is inapplicable with respect to the September 8, 2004 Transfer of the 283 Monitoring Contracts because Tepsic then possessed a security interest in the latter contracts.  However, the Court now holds as well, as a matter of law, that Tepsic's execution upon his security interest in the 283 Monitoring Contracts – via the September 8, 2004 Transfer – constitutes a "transfer" for purposes of § 547(b) because such execution effected (a) at least a transfer of the Debtor's possession of, custody of, and control over the 283 Monitoring Contracts, and (b) a transfer of the Debtor's title to such contracts as well, given that Tepsic possessed, prior to such execution, no more than a collateral interest in such contracts.  *See* <u>Pearson Industries</u>, 142 B.R. at 839-840 (repossession pursuant to security interest or retained title constitutes a "transfer"); <u>In re Kilroy</u>, 354 B.R. 476, 497 (Bankr.S.D.Tex. 2006) (foreclosure,

that is execution, upon a security interest in personalty constitutes a "transfer").[20]

As for Tepsic's reliance on the decision in In re Le Café Creme, Ltd., the Court notes that nowhere in such decision did the Le Café Creme court actually hold that an execution upon a security interest does not constitute a "transfer" for purposes of § 547(b). Instead, what the Le Café Creme court apparently held, relevant to why Tepsic relies thereupon, was that, under the particular circumstances presented therein, installment payments made by the debtor therein to an insider within one year of bankruptcy in satisfaction of an antecedent debt (created by way of the conveyance of a promissory note), which debt itself was incurred by such debtor well outside of such one-year period, constituted "transfers" for purposes of § 547(b) as of the date when such antecedent debt was incurred (i.e., when such note was conveyed by the debtor) – in other words, such payments constituted "transfers" but not ones that could be avoided as preferential because they occurred outside of the aforesaid one-year period. See Le Café Creme, 244 B.R. at 233-234. Tepsic attempts to draw an analogy between his position and the foregoing apparent holding in Le Café Creme; to be consistent with Le Café Creme, what Tepsic actually means to

---

[20]The reason, no doubt, for the dearth of case authority to the effect that an execution upon a security interest constitutes a "transfer" for purposes of § 547(b) is that it is the rare case when a secured creditor loses a preference action given that, by virtue of such creditor's security interest, such creditor will generally prevail with respect to the requisite "preferential effect" element set forth in § 547(b)(5); of course, if such creditor prevails under § 547(b)(5), then it matters not – and thus a court need not write about – whether a bankruptcy trustee can prove the remaining elements under § 547(b), such as whether a "transfer" has occurred.

argue then is that (a) an execution upon a security interest constitutes a "transfer" for purposes of § 547(b), but (b) such "transfer" is deemed to have occurred only as of the date upon which the security interest was first obtained (which date in the instant case with respect to Tepsic's security interest in the 283 Monitoring Contracts, as set forth earlier herein, was substantially outside of the one-year period prior to the date of the Debtor's bankruptcy petition filing, *see* supra Disc. (pt. I. A), thus defeating a preference action with respect to such contracts).  Unfortunately for Tepsic, his foregoing attempt at analogizing to the aforesaid holding in Le Café Creme fails for at least the following reason.  While it appears to be the case that the court in Le Café Creme reasoned, as the rationale for its aforesaid holding, that, at least under the particular circumstances presented therein, payments that are to subsequently be made on a note are indistinguishable – that is, according to the Le Café Creme court, "are not divisible" – from the conveyance of such note itself, *see* Id. at 234, such reasoning cannot be extended to a grant of, and then an execution upon, a security interest.  Such reasoning cannot so be extended because the grant of a security interest is necessarily distinguishable, yes divisible, from an execution upon such security interest; the former act bestows upon the one receiving it nothing more than a partial – to be precise, a collateral – interest in property of the debtor, whereas the latter results in one obtaining the remaining, and thus the entire, interest in such property (i.e., absolute title).  Therefore, Tepsic's attempt at drawing an analogy between his position and the foregoing apparent holding in Le Café Creme fails.  The Court also notes, and not merely as an aside, that it is

54

frankly skeptical, in the first instance, as to the propriety of the aforesaid holding

in Le Café Creme.  Indeed, the Court holds that, if it were necessary (for

instance, if Tepsic could properly draw an analogy between his position and Le

Café Creme), then the Court would reject such holding in Le Café Creme, which

rejection would also serve to disable Tepsic's reliance on such decision.[21]  The

Court particularly questions the propriety of, to the point of simply disagreeing

with, the aforesaid holding in Le Café Creme if such holding can be used to

support Tepsic's position that an execution upon a security interest does not

constitute a "transfer" because, if such holding can be so construed, then it is

inconsistent with, indeed flies in the face of, the language in § 101(54), such

statutory provision's accompanying legislative history, and persuasive (and

contrary) case and treatise authority.

Therefore, the September 8, 2004 Transfer of the 283 Monitoring

Contracts constitutes a "transfer" of the Debtor's property within the meaning of

§ 547(b).


**B.      The transfer of the 283 Monitoring Contracts and § 547(b)(5).**

So as to satisfy § 547(b)(5) with respect to Count 1, the Trustee contends

that, had the September 8, 2004 Transfer of the 283 Monitoring Contracts not

---

[21]The Court's skepticism regarding the propriety of the aforesaid holding in
Le Café Creme is bolstered by the fact (a) that, upon the Court's own
examination, Le Café Creme has been cited in 18 subsequent decisions, and (b)
that in none of such decisions is the holding in question even remotely referred to
or relied upon.

55

occurred, then he would have been able to successfully obtain from the Court,

via 11 U.S.C. § 510(c), an equitable subordination of Tepsic's security interest in

such contracts.

11 U.S.C. § 510(c) provides, in pertinent part, that:

... the court may —

(1)  under principles of equitable subordination, subordinate

for purposes of distribution all or part of an allowed claim to all or

part of another allowed claim or all or part of an allowed interest to

all or part of another allowed interest; or

(2)  order that any lien securing such a subordinated claim

be transferred to the estate.

11 U.S.C.A. § 510(c) (West 2004).  So as to be consistent with the foregoing

language of § 510(c), what the Trustee actually contends is that, absent such

transfer, he would have been able to successfully equitably subordinate Tepsic's

secured claim against the Debtor to all other allowed claims; such claim of

Tepsic, of course, is that which, absent its satisfaction by way of the September

8, 2004 Transfer, would have (a) remained outstanding, (b) been secured, at

least in part, by the 283 Monitoring Contracts, and (c) arisen by virtue of the 1999

Redemption (hereafter "Tepsic's Redemption Claim").

**(i)      Tepsic's threshold objections to the Trustee's hypothetical
equitable subordination of Tepsic's Redemption Claim.**

Having discerned that the foregoing is what the Trustee actually contends

(and the Trustee argues more clearly in certain places within his filings with the

Court) serves to dispose of one of Tepsic's main objections to such equitable

subordination, namely that the Trustee inappropriately attempts to hypothetically

equitably subordinate an interest to a claim, to wit Tepsic's security *interest* in the

283 Monitoring Contracts to all other claims allowed against the Debtor.  Tepsic

appears to be correct when he argues that § 510(c) only "authorizes the

subordination of *claims to other claims* or *interests to other interests*, but 'its

language does not extend to treatment of interests vis a vis claims.'"  In re C.R.

Amusements, LLC (Acropolis Enterprises, Inc. v. C.R. Amusements, LLC), 259

B.R. 523, 529 (Bankr.D.R.I. 2001) (emphasis theirs); *but see* In re Lifschultz Fast

Freight, 132 F.3d 339, 342 (7th Cir. 1997) ("The power of equitable

subordination, codified at 11 U.S.C. § 510(c), allows a bankruptcy court to

relegate *even a secured claim* to a lower tier, even to the lowest – the equity

tier").  However, as just clarified by the Court, what the Trustee attempts to do in

his Count 1 is not hypothetically equitably subordinate Tepsic's aforesaid security

interest to all other allowed claims; rather, the Trustee seeks to hypothetically

equitably subordinate Tepsic's Redemption Claim to all other allowed claims,

which hypothetical equitable subordination is certainly permissible under § 510(c)

(i.e., subordination of a claim to other claims).[22]

---

[22]As an aside, § 510(c)(1), when it refers to an "interest" therein, refers
only to an equity interest, not a security interest, *see, e.g.,* C.R. Amusements,
259 B.R. at 529; therefore, the language of § 510(c)(1) arguably does not
preclude the equitable subordination of a security interest to an allowed claim.
Although such is the case, it still seems to make little sense to argue that one can
equitably subordinate a security interest to an allowed claim; it makes eminently
more sense to argue that one seeks to equitably subordinate a secured claim to
another allowed claim.  That "interest" in § 510(c)(1) refers only to an equity

Tepsic also apparently contends that (a) one cannot, as a matter of law, equitably subordinate a secured claim to unsecured claims under § 510(c), although Tepsic fails to provide any legal authority for such proposition, and (b) the hypothetical equitable subordination that the Trustee seeks is thus impermissible given that (i) Tepsic's Redemption Claim is a secured claim, and (ii) most, if not all, of the other filed claims in the instant bankruptcy case are unsecured.  Unfortunately for Tepsic, a secured claim can be equitably subordinated to unsecured claims, *see* Lifschultz, 132 F.3d at 342; In re Total Containment, Inc., 335 B.R. 589, 622 (Bankr.E.D.Pa. 2005) ("11 U.S.C. § 510(c) permits subordination of claims, *even secured claims*"); moreover, 11 U.S.C. § 510(c)(2), which provides for the recapture by a bankruptcy estate of any security interest – i.e., any lien – that secures a subordinated claim, operates to aid in the equitable subordination of a secured claim to unsecured claims. Therefore, such apparent argument by Tepsic must be rejected.

Next, does the Trustee have standing to seek equitable subordination under § 510(c)?  Tepsic contends that the Trustee lacks such standing but the Court holds, as a matter of law, that the Trustee possesses such standing.  *See* In re Lockwood, 14 B.R. 374, 381 (Bankr.E.D.N.Y. 1981); In re Cajun Electric Power Co-op., Inc., 119 F.3d 349, 353 n.2 (5th Cir. 1997); In re 9281 Shore Road Owners Corp., 187 B.R. 837, 852 (E.D.N.Y. 1995); In re Fargo Financial, Inc., 80

---

interest, not a security interest, also comports with the text of § 510(c)(2), which allows for the recapture by a bankruptcy estate of any security interest – i.e., any lien – that secures a subordinated claim.

B.R. 247, 250-251 (Bankr.N.D.Ga. 1987); Mark D. Sherrill, *The Uncertain Ground of Creditors' Standing in Equitable Subordination Actions*, in 2003 No. 2 Norton Bankr. L. Adviser 3 (West 2003) ("There is little disagreement that a trustee may assert a claim for equitable subordination.  Courts have ruled inconsistently when other parties have sought to equitably subordinate a claim").  In holding as the Court does, the Court observes that neither of the cases upon which Tepsic relies hold, or for that matter even intimate, that a bankruptcy trustee lacks standing to equitably subordinate.  Instead, solely with respect to the issue of standing to equitably subordinate, (a) In re M. Paolella & Sons, Inc. (Waslow v. MNC Commercial Corp.), 161 B.R. 107 (E.D.Pa. 1993), says nothing more than that a creditor, under certain circumstances, can seek equitable subordination, not that a Trustee cannot equitably subordinate, *see* Paolella, 161 B.R. at 121, and (b) C.R. Amusements stands merely for the proposition that, if a party other than a bankruptcy trustee seeks to equitably subordinate, then such party can do so but only on its own behalf, not on behalf of someone else, *see* C.R. Amusements, 259 B.R. at 531 (Minority Shareholders lacked standing to seek equitable subordination on behalf of the tax claimants, that is such shareholders could not seek to equitably subordinate Acropolis' claim to that of the tax claimants), which proposition is a far cry from one to the effect that a bankruptcy trustee lacks standing to equitably subordinate.

Finally, can the Trustee hypothetically utilize equitable subordination so as to satisfy § 547(b)(5)?  The Court answers such question in the affirmative.  *Cf.* In re Healthcare Services, Inc., 80 B.R. 563, 565 (Bankr.N.D.Ga. 1987) ("priority

claims distribution scheme of 11 U.S.C. § 724(b)" can be utilized to satisfy

§ 547(b)(5)).

Having rejected Tepsic's threshold arguments, the Court will proceed to

address the merits of the Trustee's hypothetical equitable subordination request.

### (ii)    The Trustee's hypothetical equitable subordination of Tepsic's Redemption Claim.

Before a court can exercise the power of equitable subordination, such

court must generally ascertain that (a) "the creditor ha[s] engaged in 'some type

of inequitable conduct,' ... [(b)] the misconduct ha[s] 'resulted in injury to the

creditors of the bankrupt or conferred an unfair advantage on the claimant,' and

... [(c)] the subordination 'not be inconsistent with the provisions of the

Bankruptcy Act.'"   United States v. Noland, 517 U.S. 535, 538-539, 116 S.Ct.

1524, 1526, 134 L.Ed.2d 748 (U.S. 1996) (quoting In re Mobile Steel Corp., 563

F.2d 692, 700 (5th Cir. 1977)).   However, "creditor misconduct is not a

prerequisite for equitable subordination" in the Third Circuit after the Third

Circuit's decision in In re Burden.   See In re Burden, 917 F.2d 115, 120-121 (3rd

Cir. 1990); see also Noland, 517 U.S. at 543, 116 S.Ct. at 1528 ("we need not

decide today whether a bankruptcy court must always find creditor misconduct

before a claim may be equitably subordinated").   Thus, "the Third Circuit

recognizes a claim of 'no fault' equitable subordination."   In re Montgomery Ward

Holding Corp. (Montgomery Ward Holding Corp. v. Schoeberl), 272 B.R. 836,

845 (Bankr.D.Del. 2001) (relying on Third Circuit decision in Burden); In re

Montgomery Ward Holding Corp. (Montgomery Ward Holding Corp. v.

60

McCaffery), 2000 WL 33712303 at 4 (Bankr.D.Del. 2000) (same).

Nevertheless, "the Third Circuit [in Burden] admonishe[s] that subordinating [] a claim [of a creditor can]not be automatic and that a bankruptcy court must consider the equities of the individual case." Montgomery Ward (McCaffery), 2000 WL 33712303 at 4. Therefore, one could not (a) obtain equitable subordination of a stock redemption claim, such as Tepsic's Redemption Claim, "simply because it is a stock redemption claim," see Id. at 5, and (b) usually prevail on a claim of "no fault" equitable subordination at the summary judgment stage, see Id. at 4. Of course, and as set forth above when the Court discussed the issue of insider status, if the relevant underlying facts are undisputed, then a trial court may decide, on a summary judgment motion, whether such facts satisfy the relevant standard, see supra Disc. (pt. I. D); therefore, one may prevail on a "no fault" equitable subordination claim via summary judgment if the relevant underlying facts are undisputed and the same compel such subordination. As well, that a court cannot equitably subordinate a stock redemption claim just because it is such a claim "is not to say that, after consideration of the facts of the case, subordination of ... [such] claim may not be appropriate for that reason." Id. at 5.

A court should consider the following facts, that is equities, when it assesses whether to equitably subordinate a stock redemption claim: (a) whether (although unlikely) the redeeming debtor corporation received anything of value in return for such redemption, see Id. at 3; (b) the manner in which the stock redemption claimant acquired the stock that was redeemed, see Id. at 5 n.5; (c)

the presence of any affiliation between the redeeming debtor corporation and the

stock redemption claimant, especially if such claimant was an insider, *see* Id.; (d)

who initiated the stock redemption, *see* Id.; (e) "the relative effect of

subordination on other claims," Id.; (f) whether the stock redemption rendered the

redeeming debtor corporation insolvent, *see* Id.; and (g) whether such stock

redemption was accompanied by other inequitable conduct.

Applying the foregoing law to the instant matter, the Court concludes – at

the summary judgment stage – that, if the September 8, 2004 Transfer had not

occurred, then the Trustee would have succeeded in (a) equitably subordinating

Tepsic's Redemption Claim to all other claims, and (b) obtaining for the Debtor's

bankruptcy estate, via § 510(c)(2), Tepsic's security interest in the 283

Monitoring Contracts.  Such summary judgment is appropriate for several

reasons.

First, the undisputed facts herein and an application of the relevant law to

the same establish that:

(a)     The Debtor received nothing of value from Tepsic in return for the 1999

        Redemption.  The foregoing conclusion follows as a matter of law because

        Tepsic did nothing more via such redemption than deliver over to the

        Debtor 949 shares of stock that he then held in the Debtor; such a

        redemption "is a method for a corporation to make a distribution to a

        stockholder, for which the corporation acquires nothing of value in return."

        Id. at 3 (citing In re Envirodyne Indus., Inc., 79 F.3d 579, 582 (7th Cir.

        1996); In re New Era Packaging, Inc., 186 B.R. 329, 336 (Bankr.D.Mass.

1995); In re SPM Mfg. Corp., 163 B.R. 411, 416 (Bankr.D.Mass. 1994)).

(b)     Tepsic acquired the stock in the Debtor that was redeemed in 1999 by

virtue of his own sole creation of the Debtor just eight years earlier.

(c)     From the inception of the Debtor until August 31, 1999, when the 1999

Redemption was consummated, Tepsic was the sole shareholder, sole

director, and the president of the Debtor; in other words, he was much

more than just an insider of the Debtor, he essentially was the Debtor.

Thereafter, and as set forth in the Court's discussion above regarding

Count 2, Tepsic remained an insider of the Debtor, see supra Disc. (pt. I.

D); indeed, as the Court held above, Tepsic remained such an insider as

of September 8, 2004, see supra Disc. (pt. I. D).

(d)     Tepsic initiated the 1999 Redemption, and at a time when he was in sole

control of the Debtor.

(e)     Tepsic's Redemption Claim, absent its extinguishment via the September

8, 2004 Transfer, would have constituted the only "shareholder" claim that

existed against the Debtor when the Debtor filed for bankruptcy.  See

Montgomery Ward (McCaffery), 2000 WL 33712303 at 2 (citing cases for

the proposition that a redemption claim is to be equated with stockholder

status, that is the promissory note that is received by the redemption

claimant remains an equity obligation).  Consequently, the equitable

subordination that the Trustee would have sought, that is such that

Tepsic's Redemption Claim would have been paid last after all others

were paid first (and that Tepsic's security interest in the 283 Monitoring

63

Contracts would have been transferred to the Debtor's bankruptcy estate),

is justified.

(f)    The 1999 Redemption immediately rendered the Debtor insolvent, and by

a substantial amount.  As well, such redemption also resulted in

essentially all of the Debtor's assets at the time becoming encumbered in

favor of Tepsic so as to secure Tepsic's Redemption Claim.  Finally, the

Debtor's annual profits for the three-year period prior to, and inclusive of,

the 1999 Redemption were at a level that would have been insufficient to

even allow the Debtor to service the $204,002.76 worth of Redemption

Price monthly instalment payments that the Debtor, on an annual basis,

became obligated to make to Tepsic; such point, at a bare minimum,

should have brought to Tepsic's attention not only the specter of a likely

default by the Debtor in the future with respect to Tepsic's Redemption

Claim, but also the likelihood that, if the Debtor wished not to so default,

then it would eventually have to default on obligations to at least certain of

its other future creditors.

(g)    The security interest that the Debtor granted to Tepsic as part of the 1999

Redemption transaction – i.e., a security interest in essentially all of the

Debtor's assets that then existed – secured not only Tepsic's Redemption

Claim against the Debtor but also, as set forth in the Statement of Facts,

the obligations of a nondebtor, to wit Duvall's obligations under the 51

Stock Sale Agreement, *see* <u>supra</u> St. of Facts (pt. I); Tepsic's grant of

such security interest, on behalf of the Debtor, so as to secure an

64

obligation of someone other than the Debtor, the Court holds as a matter of law, constitutes inequitable, not to mention particularly abusive, conduct.

Second, the foregoing points, as a matter of law, would have compelled (a) an equitable subordination of Tepsic's Redemption Claim, as well as (b) a transfer, via § 510(c)(2), of Tepsic's security interest in the 283 Monitoring Contracts to the Debtor's bankruptcy estate, provided, of course, that the other two elements of equitable subordination – resulting injury to the Debtor's creditors or unfair advantage to Tepsic, and that such subordination not be inconsistent with the Bankruptcy Code – could be satisfied by the Trustee.

Third, the Debtor's creditors were, as a matter of law, injured by the 1999 Redemption transaction.  The Court so holds because (a) "[t]he type of harm to creditors sufficient for equitable subordination ... [g]enerally ... would consist of the loss of a right that impacts on the results of the bankruptcy distribution," In re Beverages International Ltd., 50 B.R. 273, 283 (Bankr.D.Mass. 1985); see also In re 604 Columbus Ave. Realty Trust, 968 F.2d 1332, 1363 (1st Cir. 1992) (same), and (b) Tepsic, by virtue of the 1999 Redemption transaction, thereby (i) elevated his equity interest to debt of the same level as other creditors, (ii) diverted assets pre-bankruptcy that such creditors could have looked to for satisfaction of their claims, (iii) ultimately diluted any distribution that such creditors could have obtained in bankruptcy, and (iv) encumbered many of the Debtor's assets, also to the detriment of such creditors.  Tepsic argues that injury sufficient for equitable subordination, as a matter of law, must, at least in part, consist of detrimental

65

reliance upon the misconduct by the creditor whose claim is sought to be

equitably subordinated; for such statement of the law, Tepsic relies on language

contained within Paolella, 161 B.R. at 121.  Tepsic then goes on to assert that

such detrimental reliance – and thus requisite injury – is impossible in the instant

matter because no creditors (at least that existed as of the instant bankruptcy

filing), and certainly not the Trustee, existed on August 31, 1999, when the 1999

Redemption was consummated.  Unfortunately for Tepsic, his reliance upon

Paolella is misplaced.  Paolella stands for the proposition that such detrimental

reliance – or at least harm traceable to equitable misconduct – must be suffered

by a particular creditor if such creditor, rather than a bankruptcy trustee, wishes

to equitably subordinate under § 510(c), see Paolella, 161 B.R. at 121; Sherrill,

*The Uncertain Ground of Creditors' Standing in Equitable Subordination Actions*,

in 2003 No. 2 Norton Bankr. L. Adviser 3; however, Paolella does not address

the injury that must be suffered by a creditor body as a whole if a bankruptcy

trustee, rather than an individual creditor, seeks to equitably subordinate, *see* Id.

(Sherrill article).  Furthermore, Tepsic is simply mistaken when he argues that

equitable misconduct is actionable under § 510(c), and that injury is sufficient for

equitable subordination, only if there existed as of the date of such misconduct at

least one creditor who was thereby injured.  *See* Beverages International, 50

B.R. at 283 ("'In examining the effect of the conduct on creditors, the court should

consider the effect of the then-known creditors, *as well as future creditors*'");

Columbus Ave. Realty Trust, 968 F.2d at 1363 (same).

Fourth, and as already alluded to earlier, the equitable subordination that

66

the Trustee would have sought, that is such that Tepsic's Redemption Claim

would have been paid last after all others were paid first, is, as a matter of law,

not inconsistent with the Bankruptcy Code.  *See* Montgomery Ward (McCaffery),

2000 WL 33712303 at 2-3 (citing cases for the proposition that a redemption

claim is to be equated with stockholder status, that is the promissory note that is

received by the redemption claimant remains an equity obligation).

Finally, the Court finds to be disingenuous, not to mention tiresome,

Tepsic's repeated arguments that the Trustee's Count 1 (if not the Trustee's

Count 2 as well) constitutes nothing more than an effort by the Trustee to avoid

as a fraudulent conveyance the Debtor's transfer of everything that Tepsic

received by way of the 1999 Redemption transaction.  Tepsic seizes upon such

strategy because the 1999 Redemption transaction, by virtue of the arguable

passage of the relevant statutes of limitation that pertain to a fraudulent

conveyance action vis-a-vis such transaction, is perhaps immune from such

attack by the Trustee at this point in time.[23]  Such arguments by Tepsic are

particularly disingenuous, however, because what the Trustee seeks to do via

Count 1 is to avoid as a preferential (not fraudulent) transfer the September 8,

2004 (not 1999) Transfer of the 283 Monitoring Contracts.  True, the Trustee, in

order to succeed on such count, must (a) demonstrate that he could have

equitably subordinated Tepsic's Redemption Claim had such claim not been

---

[23]As set forth above, the Court presently defers ruling on the Trustee's
Count 7, *see* supra St. of Lit. (pt. III), wherein the Trustee formally brings a
fraudulent conveyance avoidance action with respect to the 1999 Redemption
transaction, *see* supra St. of Lit. (pt. II).

extinguished on September 8, 2004, and (b) attack, in the course of such

equitable subordination, Tepsic's inequitable conduct with respect to the 1999

Redemption transaction; unfortunately for Tepsic, however, such efforts by the

Trustee do not equate with a fraudulent conveyance action regarding the 1999

Redemption transaction.  Moreover, the law is clear that a statute of limitations

does not exist with respect to equitable subordination actions brought under

§ 510(c).  See In re GNK Enterprises, Inc., 197 B.R. 444, 449 (Bankr.S.D.N.Y.

1996).  Therefore, the Trustee is not time-barred from attacking, via a

hypothetical § 510(c) equitable subordination action brought within the confines

of a timely – and otherwise proper – preference action, the inequitable conduct of

Tepsic that occurred in 1999, notwithstanding that such conduct perhaps cannot

now be attacked via a fraudulent conveyance action.

**(iii)    § 547(b)(5) summary.**

In light of all of the foregoing, the Trustee succeeds, at the summary

judgment stage, in hypothetically (a) equitably subordinating Tepsic's

Redemption Claim to all other claims, and (b) obtaining for the Debtor's

bankruptcy estate, via § 510(c)(2), Tepsic's security interest in the 283

Monitoring Contracts.  As a result, the Trustee succeeds, at the summary

judgment stage, in establishing that the September 8, 2004 Transfer of the 283

Monitoring Contracts had preferential effect – i.e., the Trustee satisfies

§ 547(b)(5) with respect to such transfer.

**C.    Summary of the Trustee's Count 1.**

68

Because the September 8, 2004 Transfer of the 283 Monitoring Contracts satisfies all of the elements of a preference under § 547(b), the Trustee may avoid such transfer as preferential.  Since the 283 Monitoring Contracts were previously transferred to VSI on June 16, 2005, the Trustee, pursuant to 11 U.S.C. § 550(a)(1), may recover from Tepsic the value of such contracts, which value is equal to $140,651 – i.e., 283 contracts x $497 sale price that VSI ultimately paid for such contracts.  Therefore, the Court, to the extent of a $140,651 recovery, shall grant the Trustee's summary judgment motion as it pertains to the Trustee's Count 1.[24]

## CONCLUSION

In light of the foregoing analysis, the Court shall grant the Trustee's summary judgment motion as it pertains to both Counts 1 and 2, thereby enabling the Trustee, pursuant to § 547(b), to avoid as preferential the September 8, 2004 Transfer of, collectively, the 976 Monitoring Contracts with a value of $485,072; the Trustee, pursuant to § 550(a)(1), may recover such $485,072 from Tepsic.  Because the Trustee shall prevail on Counts 1 and 2, the Court necessarily shall deny with prejudice Tepsic's summary judgment motion

---

[24]As mentioned earlier, the Trustee formally seeks in his Count 1 to avoid as preferential the transfer of the 976 Monitoring Contracts with a value equal to $485,072.  However, because the Trustee succeeds in his Count 2 in avoiding as preferential the transfer of 693 of such 976 Monitoring Contracts, which 693 Monitoring Contracts are valued at $344,421, the Trustee need, and thus can, only recover via his Count 1 for the value of the remaining 283 Monitoring Contracts (i.e., 976 – 693), or $140,651 (i.e., $485,072 – $344,421).

as it pertains to such counts.  As for Counts 3 and 4, since the relief sought in

Counts 1 and 2 encapsulate that which is sought via Counts 3 and 4, and given

that the Trustee shall prevail on both Counts 1 and 2, the Court shall deny as

moot both parties' summary judgment motions as they pertain to Counts 3 and 4.

With respect to Counts 5 and 6, the Court shall deny without prejudice both

parties' summary judgment motions as they pertain to Count 5, and shall deny

without prejudice Tepsic's summary judgment motion as the same pertains to

Count 6, because a genuine factual dispute exists which the Court finds is

material to a resolution of both such counts.  Finally, the Court, for the reasons

set forth in detail above, will deny without prejudice Tepsic's summary judgment

motion as it pertains to Count 7.

An appropriate order will be entered.

**BY THE COURT**

**/s/**_____
**M. BRUCE McCULLOUGH,**
**U.S. Bankruptcy Judge**

**DATED:       May 16, 2007**

71

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:                                          :
                                                :
**EMERGENCY MONITORING**                        :
**TECHNOLOGIES, INC.,**                          :
                                                :   **Bankruptcy No. 05-28055-MBM**
                        Debtor.                 :
.............................................................:................................................................

**Robert Shearer, Trustee of the Estate** :
**of Emergency Monitoring**                      :
**Technologies, Inc.,**                          :   **Chapter 7**
                        Plaintiff,             :
                                                :
                        v.                      :   **Adversary No. 06-2400-MBM**
                                                :
**Steve Tepsic,**                                :
                        Defendant.             :

## ORDER OF COURT

AND NOW, this **16th day** of **May, 2007**, upon consideration of the

summary judgment motions brought by each of the instant parties, namely

Robert Shearer, the Chapter 7 Trustee for the bankruptcy estate of the instant

debtor, Emergency Monitoring Technologies, Inc. (hereafter "the Trustee") (Doc.

#29), and Steve Tepsic (hereafter "Tepsic") (Doc. #17); and for the reasons set

forth in the accompanying Memorandum Opinion of the same date; and after

notice and hearings on the motions held on December 21, 2006, and January 11,

2007, it is **hereby ORDERED, ADJUDGED, AND DECREED** that:

(a)     **the Trustee's summary judgment motion** as it pertains to **Counts 1**

        **and 2** (i.e., those counts designated as such in the Trustee's Response to

        Defendant's Motion for Summary Judgment (Doc. #27), which counts and

        others so designated are hereafter referred to as "Count(s)") is

**GRANTED**, thereby enabling the Trustee, pursuant to § 547(b), to avoid

as preferential the September 8, 2004 Transfer of, collectively, 976

Monitoring Contracts with a value of $485,072;

(b)    **the Trustee**, pursuant to § 550(a)(1), may **recover** such **$485,072** from

Tepsic;

(c)    **Tepsic's summary judgment motion** as it pertains to **Counts 1 and 2** is

**DENIED WITH PREJUDICE**;

(d)    **both parties' summary judgment motions** as they pertain to **Counts 3**

**and 4** are **DENIED AS MOOT**;

(e)    **both parties' summary judgment motions** as they pertain to **Count 5**

are **DENIED WITHOUT PREJUDICE**; and

(f)    **Tepsic's summary judgment motion** as the same pertains to **Counts 6**

**and 7** is **DENIED WITHOUT PREJUDICE**.

**BY THE COURT**

**/s/**_____
**M. BRUCE McCULLOUGH,**
**U.S. Bankruptcy Judge**

cm:    Owen W. Katz, Esq.
P. O. Box 7826
Pittsburgh PA 15215

Joel M. Helmrich, Esq.
Gary A. Kern, Esq.
Meyer, Unkovic & Scott
1300 Oliver Building
Pittsburgh, PA 15222-2304

2